**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| | ) | |
| BRENNAN CENTER FOR JUSTICE | ) | |
| AT NYU SCHOOL OF LAW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:20-cv-02674-TJK |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| COMMERCE, *et al.*, | ) | |
| Defendants. | ) | |
| | ) | |

_____

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff, the Brennan Center for Justice at NYU School of Law ("Brennan Center"), respectfully moves for entry of a preliminary injunction pursuant to Federal Rule of Civil Procedure 65. Plaintiff asks this Court to enjoin Defendants from further unlawful delay in responding to and failing to produce records requested by Plaintiff under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"). The FOIA Requests concern the Trump Administration's plans for calculating the reapportionment of the U.S. House of Representatives following the conclusion of the 2020 Census.

Plaintiff asks this Court to promptly hold a hearing under Local Rule 65.1(d), and enter a preliminary injunction compelling each of the Defendants, by November 2, 2020, to do each of the following: (a) complete its processing of the FOIA Request, (b) provide to the Brennan Center copies of all agency records responsive to the FOIA Request, except to the extent that the Defendant determines to withhold all or any portion of any such responsive record based upon a claim of an exemption from mandatory disclosure under the FOIA, and (c) serve on the Brennan Center and file with this Court a *Vaughn* Index setting forth, for each withheld portion of each

responsive record (if any) that is not disclosed in full, (i) a detailed description of the withheld information and (ii) a detailed explanation of the Defendant's rationale for withholding such portion of the record.

Pursuant to Local Rule 7(m), counsel for Plaintiff certifies that it has not conferred with counsel for Defendants because such counsel have not yet entered appearances.  On October 1, 2020, counsel for Plaintiff called the United States Attorney's Office for the District of Washington, D.C. in an attempt to confer on the motion.  However, counsel for Plaintiff was informed that the government has not yet determined who will represent it in this matter and that therefore no one was available to confer.

The accompanying memorandum of points and authorities and declarations in support of the motion for preliminary injunction set forth the grounds on which the motion should be granted.  Plaintiff asks that the Court, pursuant to Local Rule 65.1(d), schedule a hearing on this application for a preliminary injunction at the Court's earliest convenience.

Dated: October 2, 2020

Respectfully submitted,

 /s/ Patrick J. Carome

Jared V. Grubow*
WILMER CUTLER PICKERING
 HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
Jared.Grubow@wilmerhale.com

Patrick J. Carome (D.C. Bar No. 385676)
WILMER CUTLER PICKERING
 HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000
Patrick.Carome@wilmerhale.com

* Pro hac vice

Caitlin W. Monahan*
Mikayla C. Foster*
Rieko H. Shepherd*
WILMER CUTLER PICKERING
 HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
Caitlin.Monahan@wilmerhale.com
Mikayla.Foster@wilmerhale.com
Rieko.Shepherd@wilmerhale.com

*Counsel for Plaintiff the Brennan Center for
 Justice at NYU School of Law*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BRENNAN CENTER FOR JUSTICE<br>  AT NYU SCHOOL OF LAW, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 1:20-cv-02674-TJK |
| UNITED STATES DEPARTMENT OF<br>  COMMERCE, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

JARED V. GRUBOW*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007


\* *Pro hac vice*

PATRICK J. CAROME (D.C. Bar No. 385676)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006

CAITLIN W. MONAHAN*
MIKAYLA C. FOSTER*
RIEKO H. SHEPHERD*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109

*Counsel for Plaintiff the Brennan Center for*
  *Justice at NYU School of Law*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................1

FACTUAL STATEMENT ...................................................................................................4

1.    The Trump Administration's Intended Changes To The Census Count............................4

2.    The Timing for Reapportionment ..................................................................................6

3.    The Brennan Center And Its FOIA Requests ...............................................................7

4.    Statutory Framework For Timing Of Agency Responses To FOIA Requests ...................9

5.    The Brennan Center's Requests That Defendants Expedite Their Processing Of The FOIA Requests......................................................................................................11

6.    The Defendants' Failures To Properly Respond To The FOIA Requests ........................15

7.    The Rapidly Dwindling Period In Which Disclosure Can Meaningfully Inform Public Discourse On Critically Important Government Decisions.................................16

ARGUMENT ......................................................................................................................17

I.    This Court Has Jurisdiction And Authority To Grant The Requested Injunctive Relief.........................................................................................................................18

II.   The Brennan Center is Entitled to A Preliminary Injunction Compelling Each Defendant to Provide A Complete Response to the FOIA Requests Within Thirty Days from the Filing of This Motion ..........................................................................20

    A.    The Brennan Center Is Likely To Succeed On The Merits ................................. 21

        i.    The Brennan Center Is Entitled To A Substantive Response To The FOIA Requests And Production Of Responsive Records........................ 21

        ii.   The Brennan Center Is Entitled To Expedited Processing Of The FOIA Requests On Two Independent Grounds ....................................... 23

    B.    The Brennan Center Would Be Irreparably Harmed Absent Issuance of the Requested Preliminary Injunction.......................................................................... 36

    C.    The Equities And The Public Interest Weigh Heavily In Favor Of Granting The Requested Preliminary Injunction ................................................................. 41

CONCLUSION....................................................................................................................43

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014)......................................................21

*Abdullah v. Obama*, 753 F.3d 193 (D.C. Cir. 2014)...................................................21

*Al-Fayed v. Cent. Intel. Agency*, 245 F.3d 300 (D.D.C. 2001)....................................33

*Am. Civil Liberties Union v. Dep't of Justice*,
    321 F. Supp. 2d 24 (D.D.C. 2004)........................................24, 25, 26, 30, 33, 36

*American Oversight v. Dep't of State*, 414 F. Supp. 3d 182 (D.D.C. 2019)................................39

*Center for Pub. Integrity v. Dep't of Defense*,
    411 F. Supp. 3d 5 (D.D.C. 2019).........................................19, 21, 37, 39, 40, 42

*Center to Prevent Handgun Violence v. Dep't of Treasury*,
    49 F. Supp. 2d 3 (D.D.C. 1999) .............................................................42

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006)......................39

*Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice*,
    436 F. Supp. 3d 354 (D.D.C. 2020)..........................................................25

*Citizens for Responsibility & Ethics in Wash. v. Federal Elections Commission*,
    711 F.3d 180 (D.D.C. 2013) ...............................................................15

*Competitive Enter. Inst. v. Env't Prot. Agency*,
    232 F. Supp. 3d 172 (D.D.C. 2017).........................................................8

*Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019)............................................4

*Elec. Privacy Info. Center v. Dep't of Justice*,
    416 F. Supp. 2d 30 (D.D.C. 2006).............................................18, 19, 38, 40

*Elec. Frontier Found. v. Office of Dir. of Nat'l Intel.*,
    2007 WL 4208311 (N.D. Cal. Nov. 27, 2007) ...............................................39

*FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109 (D.D.C. 2015) ......................................21

*Jacksonville Port. Auth. v. Adams*, 556 F.2d 52 (D.C. Cir. 1977) .................................41

*Judicial Watch, Inc. v. Dep't of Homeland Sec.*, 895 F.3d 770 (D.D.C. 2018)...........................21

*Landmark Legal Found. v. Env't Prot. Agency*,
    910 F. Supp. 2d 270 (D.D.C. 2012)..........................................................32

*Nat'l Urban League v. Ross*, --- F.3d ---, 2020 WL 5815054
(9th Cir. Sept. 30, 2020) ................................................................................................7

*Nat'l Urban League v. Ross*, --- F. Supp. 3d ---, 2020 WL 5739144
(N.D. Cal. Sept. 24, 2020) .............................................................................................7

*New York v. Trump*, --- F. Supp. 3d ---, 2020 WL 5422959
(S.D.N.Y. Sept. 10, 2020) .............................................................................................28

*Nken v. Holder*, 556 U.S. 418 (2009) .............................................................................21

*NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978)................................20, 42

*Oglesby v. Dep't of the Army*, 920 F.2d 57 (D.C. Cir. 1990) .........................................18

*Oversight v. Dep't of Justice*, 292 F. Supp. 3d 501 (D.D.C. 2018) .................................24

*Payne Enters., Inc. v. United States*, 837 F.2d 486 (D.C. Cir. 1988) ...........................39

*Progress v. Consumer Fin. Prot. Bureau*,
2017 WL 1750263 (D.D.C. May 4, 2017)......................................................................32

*\*Protect Democracy Project v. Dep't of Defense*,
263 F. Supp. 3d 293 (D.D.C. 2017)...............................................19, 32, 33, 35, 41

*Washington Post v. Dep't of Homeland Security*,
459 F. Supp. 2d 61 (D.D.C. 2006) ..................................................................37, 39, 40

## STATUTES, RULES, AND REGULATIONS

U.S. Const. amend. XIV, § 2 ..........................................................................................4, 5

2 U.S.C. § 2a ......................................................................................................................20

2 U.S.C. § 2a(a).................................................................................................................9

5 U.S.C. § 552, *et seq.*......................................................................................................2

5 U.S.C. § 552(a)(3)(A) ...................................................................................................9, 22

5 U.S.C. § 552(a)(4)(B) ...................................................................................................18

5 U.S.C. § 552(a)(6)(A)(i) ..............................................................................................10, 21

5 U.S.C. § 552(a)(6)(B)(i)................................................................................................10, 21

5 U.S.C. § 552(a)(6)(B)(ii) ..............................................................................................21

5 U.S.C. § 552(a)(6)(B)(iii)(I)–(III) .................................................................41

5 U.S.C. § 552(a)(6)(C)(i) .......................................................................10, 18

5 U.S.C. § 552(a)(6)(E) ............................................................................11, 22

5 U.S.C. § 552(a)(6)(E)(i) ...............................................................................23

5 U.S.C. § 552(a)(6)(E)(i)(II) ..................................................................10, 11

5 U.S.C. § 552(a)(6)(E)(ii)(I) ..................................................................10, 12

5 U.S.C. § 552(a)(6)(E)(iii) ................................................................11, 18, 30

5 U.S.C. § 552(a)(6)(E)(v)(II) .....................................10, 11, 13, 24, 31, 33

5 U.S.C. § 705 ....................................................................................................7

13 U.S.C. § 141(b) .........................................................................................8, 9

5 C.F.R. § 1303.40(e)(1) .................................................................................23

5 C.F.R. § 1303.40(e)(1)(ii) .....................................................................10, 11, 31

5 C.F.R. § 1303.40(e)(1)(iv) ..........................................................10, 11, 13, 24

15 C.F.R. § 4.6(f)(1) ........................................................................................23

15 C.F.R. § 4.6(f)(1)(iii) ...............................................................10, 11, 13, 24

15 C.F.R. § 4.6(f)(1)(iv) ...........................................................................10, 11, 31

28 C.F.R. § 16.5(e)(1) .....................................................................................23

28 C.F.R. § 16.5(e)(1)(ii) .........................................................................10, 11, 31

28 C.F.R. § 16.5(e)(1)(iv) ..............................................................10, 11, 13, 24

84 Fed. Reg. 33,821 (July 16, 2019) ...............................................................5

85 Fed. Reg. 44,679 (July 23, 2020) ...............................................................6

## OTHER AUTHORITIES

Aaron Boyd, *How Census is Building a Citizenship Database Covering Everyone Living in the U.S.*, NEXTGOV (Apr. 1, 2020), https://www.nextgov.com/ analyticsdata/2020/04/how-census-building-citizenship-database-covering-everyone-livingus/164275 ...............................................................14

Adam Shaw & John Roberts, *Trump Signs Order to Prevent Illegal Immigrants from Being Counted in Redrawing of Voting Districts*, Fox News (July 21, 2020), https:// www.foxnews.com/politics/trump-to-sign-order-illegal-immigrants-voting-districts ..................................................................................28

Andrew Restuccia & Paul Overberg, *Trump Moves to Exclude Unauthorized Immigrants from Counts for Congressional Seats*, Wall St. J. (July 21, 2020), https:// www.wsj.com/articles/trump-moves-to-bar-who-are-people-in-u-s-illegally-from-being-counted-in-congressional-apportionment-11595352083 ....................................................................28, 30

Brett Samuels & Rafael Bernal, *Trump Aims To Bar Undocumented Immigrants From Counting Toward House Representation*, Hill (July 21, 2020), https://thehill.com/latino/508314-trump-aims-to-bar-undocumented-immigrants-from-counting-toward-house-representation ..................................29

Dan Mangan & Tucker Higgins, *Trump Abandons Fight to Put Citizenship Question on Census, Says He Can Get Data From Existing Records*, CNBC (July 11, 2019, 5:49 PM), https://www.cnbc.com/2019/07/11/trump-abandons-fight-to-put-citizenship-question-on-census.html..................................13

David Jackson, *Trump Tells Census to Not Count Undocumented People for Purposes of Deciding House Apportionment*, USA Today (July 21, 2020), https:// www.usatoday.com/story/news/politics/2020/07/21/trump-tell-census-not-countundocumented-immigrants/5459873002 ...............................................27

Dudley L. Poston, Jr. & Teresa A. Sullivan, *Excluding Undocumented Immigrants from the 2020 U.S. House Apportionment*, UVA Ctr. for Politics (July 30, 2020), http://centerforpolitics.org/crystalball/articles/excluding-undocumented-immigrantsfrom-the-2020-u-s-house-apportionment.........................13, 29

*Frequently Asked Questions (FAQs)*, U.S. Census Bureau, https://www.census.gov/topics/public-sector/congressional-apportionment/about/faqs.html ............................................................................5

Hansi Lo Wang, *Census Cuts All Counting Efforts Short by a Month*, NPR (Aug. 3, 2020, 9:07 PM), https://www.npr.org/2020/08/03/898548910/census-cut-short-a-month-rushes-to-finish-all-counting-efforts-by-sept-30 ......................6, 26, 29

Hansi Lo Wang, *Court Order Keeps Census In Limbo As Counting End Date Looms*, NPR (Sept. 17, 2020), https://www.npr.org/2020/09/17/913364324/court-order-keeps-census-in-limbo-as-counting-end-date-looms..................................................................................................41

Hansi Lo Wang, *Do Trump Officials Plan to Break Centuries of Precedent in Divvying Up Congress?*, NPR (Aug. 14, 2019), https://www.npr.org/2019/08/14/749930756/do-trump-officials-plan-to-break-centuries-of-precedent-in-divvying-up-congress ..................................................................40

Hansi Lo Wang, *With No Final Say, Trump Wants to Change Who Counts for Dividing Up Congress' Seats*, NPR (July 21, 2020, 12:47 PM), https:// www.npr.org/2020/07/21/892340508/with-no-final-say-trump-wants-to-change-who-counts-for-dividing-up-congress-seat ........................................................14

John M. Abowd & Victoria Velkoff, *Update on Disclosure Avoidance and Administrative Data*, U.S. Census Bureau, at 9 (Sept. 13, 2019), https://www2.census.gov/cac/sac/meetings/2019-09/update-disclosure-avoidance-administrative-data.pdf......................................................................5

Kelly Percival, *Strong Confidentiality Laws Protect All Data the Census Bureau Collects*, Brennan Center (Dec. 5, 2019), https://www.brennancenter .org/our-work/analysis-opinion/strong-confidentiality-laws-protect-all-data-census-bureau-collects ....................................................................32

Kevin Liptak, Maegan Vazquez, Ariane de Vogue & Catherine E. Shoichet, *Trump Signs Order Targeting Undocumented Immigrants in the US Census*, CNN (July 21, 2020), https://www.cnn.com/2020/07/21/politics/ white-house-census-undocumented-immigrants/index.html ............................28

*Library: A Fair & Accurate Census*, Brennan Center, https://www. brennancenter.org/library/?issue=22&subissue=60&........................................32

Megan Tomasic, *Earlier Census Deadline Could Cause W.Pa. Officials to Accelerate Counts*, Trib. Total Media (July 31, 2020, 4:37 PM), https:// triblive.com/local/regional/local-leaders-respond-to-date-change-for-in-person-census-count-collection.............................................................................13

Michael Wines & Richard Fausset, *With Census Count Finishing Early, Fears of a Skewed Tally Rise*, N.Y. Times (Aug. 4, 2020), https:// www. nytimes.com/2020/08/04/us/2020-census-ending-early.html ..........................14

Michael Wines, *New Census Worry: A Rushed Count Could Mean a Botched One*, N.Y. Times (July 28, 2020), https:// www.nytimes.com/2020/07/28/ us/trump-census.html .....................................................................................14

Mike Schneider, *Bureau Says 2020 US Census Will Actually End Oct. 5, Not End of October*, USA Today (Sept. 29, 2020), https://www.usatoday.com/ story/news/nation/2020/09/29/2020-us-census-deadline-october-5-not-october-31-bureau-says/3570870001................................................................40

*Mission & Impact*, Brennan Center, https:// www.brennancenter.org/about/ mission-impact................................................................................................32

Nikita Lalwani & Rachel Brown, *Donald Trump's Efforts to Distort the Census Have Started Back Up*, Slate (July 17, 2020, 2:55 PM), https://slate.com/ news-and-politics/2020/07/donald-trump-census-citizenship-question-executive-order-scotus.html..............................................................................14

*Remarks by President Trump on Citizenship and the Census*, The White House
(July 11, 2019, 5:37 PM), https://www.whitehouse.gov/briefings-
statements/remarks-president-trump-citizenship-census ....................................................5

*Statement from U.S. Census Bureau Director Steven Dillingham: Delivering a
Complete and Accurate 2020 Census Count*, Release No. CB20-RTQ.23
(Aug. 3, 2020), https://www.census.gov/newsroom/press-releases/2020/
delivering-complete-accurate-count.html ...........................................................................6

Steven Shepard, *Census Bureau Will Finish Count Earlier Than Expected,
Deliver Data to Trump*, POLITICO (Aug. 3, 2020), https://
www.politico.com/news/2020/08/03/census-bureau-data-trump-391146 ..................26, 30

Tara Bahrampour, *Trump Administration Seeks to Bar Undocumented Immigrants
from a Portion of the 2020 Census*, WASH. POST (July 21, 2020),
https://www.washingtonpost.com/local/social-issues/trump-
administration-seeks-to-bar-undocumented-immigrants-from-a-portion-of-
the-2020-census/2020/07/21/9af682ee-c87f-11ea-a99f-
3bbdffb1af38_story.html ...................................................................................................30

Thomas Wolf, Kelly Percival & Brianna Cea, *Getting the Count Right: Key
Context for the 2020 Census*, BRENNAN CENTER (March 31, 2020), https://
www.brennancenter.org/sites/default/files/2020-03/CensusPrimer.pdf ...........................32

For the reasons set forth below, Plaintiff, the Brennan Center for Justice at NYU School of Law (the "Brennan Center"), respectfully asks this Court to promptly enter a preliminary injunction mandating that within 30 days of the filing of this motion—by no later than November 2, 2020—each of the Defendants complete its response to the Brennan Center's pending Freedom of Information Act requests concerning the Trump Administration's plans for calculating the reapportionment of the U.S. House of Representatives following the conclusion of the 2020 Census (the "FOIA Requests").  Defendants have *for months* unlawfully failed to respond to the FOIA Requests, and to expedite their responses, despite their clear legal obligation to do so.  The Brennan Center's legal entitlement to very prompt responses to the FOIA Requests, including the production of all non-exempt responsive records, is clear-cut.  The Brennan Center and the general public have already suffered.  And with each passing day, they are continuing to suffer irreparable injury from Defendants' unlawful failures to respond to the FOIA Requests: the requested records relate to imminent government action regarding the Census results, and an apportionment calculation that will affect the distribution of political power in the United States for the next ten years.  The requested preliminary injunction is necessary to prevent further grave and irreparable injury to the Brennan Center's ability to inform the public about these matters before it is too late.

## **INTRODUCTION**

The Department of Commerce is in the process of conducting the 2020 Census and has indicated an intent to report its results to the President in as soon as three months' time.  The 2020 Census calculations will thereafter be used for the next *ten years* to, among other things, reapportion Congressional representation among the States.  What makes this Census and reapportionment different from those of the past is that the Trump Administration has announced that, for the first time in American history, it intends to exclude certain non-citizens from the

apportionment base.  This decision, made largely in secret, is an urgent matter of great public importance as it affects each and every member of the public's representational rights.  The people of the United States have the right to understand how and why the Administration intends to exclude certain non-citizens from the apportionment base, or any other plans the Administration has for reapportionment, which will impact them and their families.  Further, the public has a right to this information not at the eleventh hour, but with enough time to fully consider, analyze, and perhaps alter the Administration's planned actions.  But with little time until the completion of the Census, the public is still in the dark because several federal agencies, all Defendants in this action, are flouting their obligations to disclose critically relevant records under the Freedom of Information Act, 5 U.S.C. § 552, *et seq.* (the "FOIA").

In light of the dearth of information concerning how the Department of Commerce intends to calculate reapportionment, or otherwise alter the state-population totals used in that calculation, and how the Trump Administration formulated its plans for reapportionment, the Brennan Center for Justice at NYU School of Law submitted nearly identical FOIA Requests to nine federal agencies involved or believed to be involved in the 2020 Census and reapportionment processes.[1] These FOIA Requests, which were all submitted in early July 2020, seek records created on or after June 27, 2019, pertaining to: (1) how specific citizenship-status data may be used in calculating the state-population totals that will be used for apportionment, and, in turn, the allocation of seats in the House of Representatives; (2) the process by which state-population totals will be reported by the Commerce Secretary to the President; and (3) the process by which the President intends to report the reapportionment of the House of Representatives to Congress.  Once

---

[1]    The accompanying Declaration of Jared V. Grubow in Support of Plaintiff's Motion for Preliminary Injunction ("Grubow Declaration") sets out the communications between the Brennan Center and each of the Defendants concerning the FOIA Requests.

it receives the requested agency records, the Brennan Center intends to report to the public about the information the records contain.  Given the time sensitivity of obtaining access to this information and increasingly intense public interest in how reapportionment will be calculated, the Brennan Center also made repeated requests to each Defendant for expedited processing of the FOIA Requests.

Despite clear statutory requirements that each Defendant expedite these requests and produce the responsive records on an expedited timeframe, the Defendants have failed to comply with even the ordinary statutory deadlines for responding to the Brennan Center's FOIA Requests. While each of those statutory deadlines is now long past, the Brennan Center has not received a single responsive record, or even any statement from any of the Defendants indicating when they might begin to comply with the FOIA Requests.  Further, each of the Defendants has either officially or constructively denied the Brennan Center's requests for expedited processing, in further contravention of basic statutory requirements.

If the Defendants fail to provide the Brennan Center with access to the requested government records in the very near future, the Brennan Center will not be able to inform the public about this matter of national importance before the die is cast and the 2020 Census and upcoming apportionment are complete.  Thus, to ensure the public ample time to digest and react to the information sought, the Brennan Center now seeks a preliminary injunction compelling each Defendant to complete its response to the FOIA Requests—including the production to the Brennan Center of all non-exempt requested records and the filing of a *Vaughn* Index justifying the withholding of any responsive record claimed to be exempt—within 30 days of the filing of the present motion, *i.e.*, by November 2, 2020.

## FACTUAL STATEMENT

**1.**      ***The Trump Administration's Intended Changes To The Census Count***

On June 27, 2019, the U.S. Supreme Court rejected the Trump Administration's unprecedented attempt to include a citizenship question on the decennial census form that goes to every housing unit in the country, holding that the government's explanation for that action was pretextual and could not "be adequately [] explained in terms of [the Department of Justice's] request for improved citizenship data to better enforce the [Voting Rights Act]." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019). What followed was a year-long effort by the Administration to collect citizenship data on persons residing within the United States through other means. Various actions and statements by the Administration indicate that the Administration is seeking this data in part so that it can alter the state-population totals used to calculate the reapportionment of Congressional seats and votes in the electoral college.

During the past year, the Administration has been maneuvering, largely in secret, to establish an unprecedented process for determining the state-populations used for the reapportionment—one that contravenes the Constitutional requirement to base congressional apportionment on the "whole numbers of persons" in each state. U.S. Const. amend. XIV, § 2. This has occurred without adequate communication from the Administration to the public about the rationales and legal authority for any changes from past practice in how state-population totals, and in turn reapportionment, are calculated. Nor has the Administration provided the public with any information to assess the likely consequences of its new policies. The Administration's willingness to depart so radically from both the law and norms for calculating the apportionment raises valid suspicions that the Administration may be planning other, similarly illegal or improper ways to manipulate the apportionment calculation.

In particular, on July 11, 2019, less than one month after the Supreme Court's decision in

the citizenship question case, the President issued Executive Order 13880, which directed the Census Bureau to collect pre-existing administrative records on citizenship from other federal agencies.  *See* 84 Fed. Reg. 33,821 (July 16, 2019).  The Executive Order articulated four purposes for collecting the data: (1) to help better understand the effects of immigration on the United States and create policy around those effects; (2) to aid in the government's implementation of certain public benefit programs; (3) to "generate a more reliable count of the unauthorized alien population in the country;" and (4) for potential aide in redistricting.  *Id.* at 33,822–24.  On the same day, the Attorney General stated that the Administration would be "studying" whether the citizenship data collected by the Census Bureau would be "relevant" to whether "illegal aliens can be included for apportionment purposes."[2]  This statement called into question clear and longstanding Census Bureau policy that "[t]he apportionment calculation is based upon the total resident population (citizens and noncitizens) of the 50 states"[3]—a policy that aligned with the Constitution's requirement that apportionment be based upon the "whole number of persons" residing in each State.[4]  U.S. Const. amend. XIV, § 2.

---

[2]   *Remarks by President Trump on Citizenship and the Census*, The White House (July 11, 2019, 5:37 PM), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-citizenship-census.

[3]   *Frequently Asked Questions (FAQs)*, U.S. Census Bureau, https://www.census.gov/topics/public-sector/congressional-apportionment/about/faqs.html (last updated March 30, 2020) ("Are undocumented residents included in the apportionment population counts? Yes, all people (citizens and noncitizens) with a usual residence in the 50 states are included in the resident population for the census, which means they are all included in the apportionment counts.").

[4]   The Census Bureau's Chief Scientist confirmed this pre-existing policy in September 2019, stating that the file used to calculate the apportionment count "does not contain any citizenship data."  The policy was unequivocal in highlighting that both citizens and non-citizens were included in calculating state-population totals for purposes of reapportionment.  John M. Abowd & Victoria Velkoff, *Update on Disclosure Avoidance and Administrative Data*, U.S. Census Bureau, at 9 (Sept. 13, 2019), https://www2.census.gov/cac/sac/meetings/2019-09/update-disclosure-avoidance-administrative-data.pdf.

Approximately one year after issuance of Executive Order 13880, on July 21, 2020, the President expressed his intention to exclude certain types of residents from the state-population totals used to calculate reapportionment.  In a memorandum entitled "Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census" (the "Exclusion Memorandum"), the President stated that "it is the policy of the United States to exclude from the apportionment base aliens who are not in a lawful immigration status."  85 Fed. Reg. 44,679 (July 23, 2020).  The Exclusion Memorandum provides no explanation for how this new policy was reached, who was involved in crafting the policy, and how it would affect the rights of persons residing within the United States.  *See id.*

## 2. *The Timing for Reapportionment*

On April 13, 2020, the Census Bureau announced that, due to complications from the COVID-19 pandemic, the Bureau would seek a four-month delay in the schedule for the 2020 Census, "extend[ing] the window for field data collection and self-response to October 31, 2020," and correspondingly, postponing the expected time for the Department of Commerce's delivery of the state-population totals for apportionment to the President until April 30, 2021 and for delivery of redistricting data to the states until July 31, 2021.[5]  But, on August 3, 2020, shortly after the White House released the Exclusion Memorandum, the Census Bureau reversed course, stating that it would "accelerate the completion of data collection and apportionment counts" to meet the original statutory deadline of December 31, 2020 for delivering apportionment data.[6]

---

[5]     *See Statement from U.S. Census Bureau Director Steven Dillingham: Delivering a Complete and Accurate 2020 Census Count*, Release No. CB20-RTQ.23 (Aug. 3, 2020), https://www.census.gov/newsroom/press-releases/2020/delivering-complete-accurate-count.html.

[6]     *See Statement from U.S. Census Bureau Director Steven Dillingham*, *supra* note 5; *see also* Hansi Lo Wang, *Census Cuts All Counting Efforts Short by a Month*, NPR (Aug. 3, 2020, 9:07 PM),  https://www.npr.org/2020/08/03/898548910/census-cut-short-a-month-rushes-to-finish-all-

Various organizations and individuals are presently suing Secretary of Commerce Wilbur Ross, among others, in a lawsuit in the Northern District of California, seeking injunctive relief that would vacate the Bureau's accelerated Census-related deadlines and reinstate the deadlines the Bureau previously began operating under due to the COVID-19 pandemic, *i.e.*, October 31, 2020 for data-collection and April 30, 2021 for delivery of apportionment data.  The Brennan Center is counsel for several plaintiffs in that lawsuit.  *Nat'l Urban League v. Ross*, 20-cv-05799-LHK (N.D. Cal.).  The district court recently issued a preliminary injunction that stays the "December 31, 2020 deadline for reporting the tabulation of the total population to the President … pursuant to 5 U.S.C. § 705"; and (2) enjoins the Secretary of Commerce, Department of Commerce, Director of the Census Bureau, and the Census Bureau from implementing the Replan deadlines.  *Nat'l Urban League v. Ross*, --- F. Supp. 3d ---, 2020 WL 5739144, at *47 (N.D. Cal. Sept. 24, 2020).  The effect of the order is to revert to the Bureau's own April 30, 2021, deadline for delivery of the Secretary's apportionment report to the President.  The Federal Government has appealed the district court's ruling and is currently seeking to have the injunction vacated; it sought an immediate administrative stay of the injunction, which was denied.  *Nat'l Urban League v. Ross*, --- F.3d ---, 2020 WL 5815054, at *4 (9th Cir. Sept. 30, 2020).  Regardless, whether state-population data is ultimately delivered to the President in December of this year, April of next year, or sometime between those dates, reapportionment is imminent.

### 3.    *The Brennan Center And Its FOIA Requests*

The Brennan Center is a non-partisan law and public policy 501(c)(3) organization that works to promote democracy and justice, primarily by writing, publishing, and disseminating

---

counting-efforts-by-sept-30 ("Delaying th[e] deadline [by four months] would allow the bureau to keep counting through Oct. 31 to 'ensure the completeness and accuracy of the 2020 Census.'").

information and commentary on American law and government and the American political process.  Declaration of Michael Waldman in Support of Plaintiff's Motion for Preliminary Injunction ("Waldman Declaration") ¶¶ 2–3.  Its work and publishing activity has included a significant focus on the census process mandated by the U.S. Constitution.  *Id.* ¶¶ 5–7.

During the first 10 days of July 2020, as part of its work on these issues, the Brennan Center submitted nearly identical FOIA Requests to each of the Defendants, namely the Department of Commerce, the Census Bureau, several offices and divisions of the Department of Justice ("DOJ"),[7] and the Office of Management and Budget ("OMB").[8]  *See* Grubow Decl. ¶¶ 4, 8, 18, 23, 28, 33, 38, 43, 48; Compl., Dkt. 1, Exs. A–I.  Each of the FOIA Requests described the agency records being sought as follows:

> All records created on or after June 27, 2019, pertaining to how any of the citizenship-status data collected pursuant to Executive Order 13880 can, could, should, or may be used, incorporated, referenced, or considered in any of the following activities:
>
> - calculating or otherwise formulating the 2020 total national population;
> - calculating or otherwise formulating the 2020 state-population totals to be used to apportion the United States House of Representatives as contemplated by 13 U.S.C. § 141(b) (hereinafter, the "2020 state-population totals");

---

[7]    The DOJ components that received the Requests are the Office of the Attorney General ("OAG"), the Office of the Assistant Attorney General ("OAAG"), the Office of the Deputy Attorney General ("ODAG"), the Office of Legal Counsel ("OLC"), the Office of Legal Policy ("OLP"), and the Civil Rights Division.

[8]    The FOIA Requests to the Department of Commerce, Civil Rights Division, and OLC, were sent via electronic mail on July 1, 2020 and the FOIA Request to OMB was sent via electronic mail on July 10, 2020.  Grubow Decl. ¶¶ 4, 18, 43, 48; Dkt. 1, Exs. A, C, G, I.  Each of the requests sent via electronic mail is deemed to have been "received" by the respective agencies on the date of transmission.  *See Competitive Enter. Inst. v. Env't Prot. Agency*, 232 F. Supp. 3d 172, 182 (D.D.C. 2017).  Each of the remaining FOIA Requests was initially sent via the U.S. Postal Service on July 2, 2020.  Grubow Decl. ¶¶ 8, 23, 28, 33, 38; Dkt. 1, Exs. B, D, E, F, H.  The Department of Justice's Office of Information Policy ("OIP") coordinated the response from the OAG, ODAG, OAAG, and OLP and confirmed the date of those components' receipt of the FOIA Requests was July 13, 2020.  Grubow Decl. ¶¶ 24, 29, 34, 39; Dkt. 1, Ex. DD.  The FOIA Request to the Census Bureau was "Returned Undelivered" to the Brennan Center's counsel on July 21, 2020, and a copy of that request was resent via email to Census Bureau FOIA representatives that same day.  Grubow Decl. ¶¶ 9–10; Dkt. 1, Ex. B; Ex. KK.

- reporting the 2020 state-population totals to President Trump by the Secretary of Commerce as required under 13 U.S.C. § 141(b);
- reporting by President Trump to Congress the 2020 state-population totals and number of congressional representatives to which each state is entitled, as required under 2 U.S.C. § 2a(a);
- changing the Census Bureau's policy for calculating the 2020 state-population totals, which currently states the 2020 state-population totals will be calculated using the Census Unedited File;
- changing the Census Bureau's policy for creating the Census Unedited File, which currently states the Census Unedited File will not contain any citizenship status data.

All records created on or after June 27, 2019, pertaining to the process by which the Secretary of Commerce will report the 2020 state-population totals to President Trump, as required under 13 U.S.C. § 141(b).

All records created on or after June 27, 2019 pertaining to the process by which President Trump will report to Congress the 2020 state-population totals and number of congressional representatives to which each state is entitled thereunder, as required under 2 U.S.C. § 2a(a).

*See, e.g.*, Dkt. 1, Ex. A, at  A-002–003.  The FOIA Requests also asked, in particular, that each Defendant agency specifically search for and produce responsive agency records pertaining to or reflecting communications between or among the Defendants and certain individuals employed by Defendants and individuals and entities that the Brennan Center understands may have been involved in advocating for particular changes in how the Bureau creates, compiles, or reports either the state-population totals used for reapportionment, or the reapportionment calculation.  *See, e.g.*, *id.* at A-003–005.

     **4.**      ***Statutory Framework For Timing Of Agency Responses To FOIA Requests***

The FOIA provides that agencies must make agency records "promptly available" to any person whose request "reasonably describes such records" and is made in accordance with agency rules and regulations.  5 U.S.C. § 552(a)(3)(A).

Within 20 working days of receiving a FOIA request, an agency must determine whether it will comply with the request and produce all non-exempt responsive agency records.  *Id.*

§ 552(a)(6)(A)(i).  If certain "unusual circumstances" exist, the twenty-working-day deadline may be extended, but generally for no more than 10 days (for a maximum response period of 30 working days).  *Id.* § 552(a)(6)(B)(i).  Failure by an agency to provide a legally sufficient response by the deadline exhausts the requester's administrative remedies and allows for immediate judicial review.  *Id.* § 552(a)(6)(C)(i).

Persons seeking records under the FOIA may apply for *expedited* processing of their request by showing a "compelling need" for the records requested.  *Id.* § 552(a)(6)(E)(i)(I)–(II).  The statutory definition of "compelling need" includes, in pertinent part, "urgency to inform the public concerning actual or alleged Federal Government activity" when the request is "made by a person primarily engaged in disseminating information."  *Id.* § 552(a)(6)(E)(v)(II).[9]  The FOIA also requires all federal agencies to promulgate regulations providing for expedited processing in other circumstances.  *Id.* § 552(a)(6)(E)(i)(II).  Pursuant to that requirement each Defendant is subject to regulations specifying that its processing of FOIA requests shall be expedited where the request pertains to "[a] matter of widespread and exceptional … interest" as to which there are possible "questions" "about the [g]overnment's integrity [which] [a]ffect public confidence."[10]  Agencies must provide "a determination of whether to provide expedited processing … within 10 days after the date of the request."  *Id.* § 552(a)(6)(E)(ii)(I).  If entitlement to expedition is demonstrated, the agency "shall process as soon as practicable any request for records."  *Id.* § 552 (a)(6)(E)(iii).  An agency's denial of, or failure to respond within 10 days to, a request for expedited processing is subject to immediate judicial review on the record before the agency at the time of

---

[9]    *See also* 15 C.F.R. § 4.6(f)(1)(iv) (Commerce Department and Census Bureau); 28 C.F.R. § 16.5(e)(1)(ii) (Department of Justice components); 5 C.F.R. § 1303.40(e)(1)(ii) (OMB).

[10]    15 C.F.R. § 4.6(f)(1)(iii) (Commerce Department and Census Bureau); 28 C.F.R. § 16.5(e)(1)(iv) (Department of Justice components); 5 C.F.R. § 1303.40(e)(1)(iv) (OMB).

such determination or denial.  *Id.*

### 5.   *The Brennan Center's Requests That Defendants Expedite Their Processing Of The FOIA Requests*

Given the urgent need for access to the requested records, each of the Brennan Center's FOIA Requests included a request that the recipient agency expedite its processing of the FOIA Request pursuant to 5 U.S.C. § 552(a)(6)(E) and the recipient Defendant's applicable regulations, *see* 15 C.F.R. §§ 4.6(f)(1)(iii), (iv) (Commerce Department and Census Bureau); 28 C.F.R. §§ 16.5(e)(1)(ii), (iv) (DOJ components); 5 C.F.R. §§ 1303.40(e)(1)(ii), (iv) (OMB).  In requesting expedition, the Brennan Center invoked two of the grounds that require Defendants to expedite FOIA requests, explaining (1) that the agency records being sought are "[a] matter of widespread and exceptional media interest involving questions about the Government's integrity which affect public confidence," 5 U.S.C. § 552(a)(6)(E)(i)(II);[11] and (2) that the Brennan Center is "primarily engaged in disseminating information" and there is "[a]n urgency to inform the public about an actual or alleged Federal Government activity," *id.* § 552(a)(6)(E)(v)(II).[12]  The Brennan Center cited a "plethora of reporting about how the Trump Administration plans to collect citizenship data," and explained that this raised questions about why the Administration "challenge[d] … the Census Bureau's well-settled policy" to count non-citizen individuals in state-population totals used for apportionment.  *See, e.g.*, Dkt. 1, Ex. A, at A-006.  The expedition request further explained that "urgency exist[ed] because any action taken by the government to incorporate citizenship status into the calculations for apportioning congressional seats would … mark a monumental shift in methodology," *id.* at A-006–007, and that expedition was urgently needed "to

---

[11]   15 C.F.R.  § 4.6(f)(1)(iii)  (Commerce Department and Census Bureau); 28 C.F.R. § 16.5(e)(1)(iv) (Department of Justice components); 5 C.F.R. § 1303.40(e)(1)(iv) (OMB).

[12]   15 C.F.R.  § 4.6(f)(1)(iv)  (Commerce Department and Census Bureau); 28 C.F.R. § 16.5(e)(1)(ii) (Department of Justice components); 5 C.F.R. § 1303.40(e)(1)(ii) (OMB).

inform the public about how the federal government is affecting their representational rights," *id.* at A-007.

Soon after the Brennan Center submitted the FOIA Requests, the already high degree of public concern and interest in the 2020 Census generally, and in whether and how certain non-citizens would be included in the count in particular, became even more intense. In particular, increased interest was spurred by the President's issuance of the Exclusion Memorandum on July 21, 2020. Public interest and concern were then further augmented by the Census Bureau's announcement on August 3, 2020, that it was abandoning its previously announced plan to interpose a four-month delay of the key steps of the 2020 Census due to delays caused by the COVID-19 pandemic and was reverting to the originally planned deadlines, under which the report of the Census count to the President would occur by December 31, 2020, not the Census Bureau's previously-announced date of April 30, 2021.

None of the Defendants granted the Brennan Center's requests for expedition. As of August 13, 2020, six of the Defendants had affirmatively denied expedition, albeit without providing any detailed justification for doing so, while the remaining Defendants had failed to act on the requests for expedition, notwithstanding the FOIA's explicit command that requests for expedition be evaluated and either granted or denied within 10 calendar days after the date of the request. 5 U.S.C. § 552(a)(6)(E)(ii)(I).

On August 13, 2020, in the face of Defendants' uniform failure to grant the Brennan Center's original requests for expedited processing, and in light of intensified levels of public concern about the 2020 Census, the Brennan Center emailed letters to each Defendant renewing and supplementing its requests for expedited processing ("Supplemental Expedited Processing Letters"). Grubow Decl. ¶¶ 5, 15, 20, 25, 30, 35, 40, 45, 50; Dkt. 1, Exs. J–R. As with the original

requests for expedition, the Supplemental Expedited Processing Letters again invoked 5 U.S.C. § 552(a)(6)(E)(v)(II) and the agencies' regulations[13] as requiring each Defendant to expedite its response to the FOIA Requests.

In support of the Brennan Center's entitlement to expedited processing, the Supplemental Expedited Processing Letters cited to a wide array of publications reporting on the Census and analyzing the Administration's actions and potential motivations.  For example, the Letters pointed to published reports concerning the potential impacts on different States' representation in Congress and access to federal resources depending on the manner in which population totals may be calculated.[14]  *See, e.g.*, Dkt. 1, Ex. J, at J-004–012.  The Letters also cited extensive public commentary and debate regarding the Administration's potential motivations for altering the methodology by which state-population totals and reapportionment are to be calculated as well as its decision to report the state-population totals by the end of the year, including many articles contending that the Administration's actions had been improperly influenced by partisan politics and discriminatory motives against certain non-citizens and minority populations.[15]  Also cited in

---

[13]    15 C.F.R. § 4.6(f)(1)(iii) (Commerce Department and Census Bureau); 28 C.F.R. § 16.5(e)(1)(iv) (DOJ components); 5 C.F.R. § 1303.40(e)(1)(iv) (OMB).

[14]    *See, e.g.*, Megan Tomasic, *Earlier Census Deadline Could Cause W.Pa. Officials to Accelerate Counts*, TRIB. TOTAL MEDIA (July 31, 2020, 4:37 PM), https://triblive.com/local/regional/local-leaders-respond-to-date-change-for-in-person-census-count-collection (estimating that the decision to cut short in-person counting efforts could result in "catastrophic outcomes for cities and towns across the country who rely on federal funding and congressional apportionment"); Dudley L. Poston, Jr. & Teresa A. Sullivan, *Excluding Undocumented Immigrants from the 2020 U.S. House Apportionment*, UVA CTR. FOR POLITICS at tbl. 1 (July 30, 2020),    https://centerforpolitics.org/crystalball/articles/excluding-undocumented-immigrants-from-the-2020-u-s-house-apportionment (showing House seat projections in Alabama, California, Minnesota, New Jersey, Ohio, and Texas depending on whether undocumented immigrants are excluded).

[15]    *See, e.g.*, Dan Mangan & Tucker Higgins, *Trump Abandons Fight to Put Citizenship Question on Census, Says He Can Get Data From Existing Records*, CNBC (July 11, 2019, 5:49 PM),    https://www.cnbc.com/2019/07/11/trump-abandons-fight-to-put-citizenship-question-on-

the Letters were numerous other articles addressing issues such as the constitutionality of excluding certain non-citizens from state-population totals, whether or not the citizenship information being collected by the Census Bureau pursuant to Executive Order 13880 would create an accurate statistical model of citizenship in the United States, and whether the Census can be fully completed by the end of the year.[16]  And the Letters also pointed to evidence of public concern over the Administration's apparent unwillingness to explain its rationales for changed Census policies, which have left the public to speculate as to what justifications underscore the Administration's choices, which may hamper the accuracy of the Census, and in turn impact the accuracy and fairness of reapportionment and the distribution of public funding.[17]

---

census.html ("It is clear he simply wanted to sow fear in immigrant communicates and turbocharge Republican gerrymandering efforts by diluting the political influence of Latino communities."); Nikita Lalwani & Rachel Brown, *Donald Trump's Efforts to Distort the Census Have Started Back Up*, SLATE (July 17, 2020, 2:55 PM), https://slate.com/news-and-politics/2020/07/donald-trump-census-citizenship-question-executive-order-scotus.html ("The American Statistical Association decried the news [of two new partisan appointees] as creating 'the perception—if not reality—of improper political influence.'").

[16]     *See, e.g.*, Hansi Lo Wang, *With No Final Say, Trump Wants to Change Who Counts for Dividing Up Congress' Seats*, NPR (July 21, 2020, 12:47 PM), https://www.npr.org/2020/07/21/892340508/with-no-final-say-trump-wants-to-change-who-counts-for-dividing-up-congress-seat ("Since the first U.S. census in 1790, both U.S. citizens and noncitizens—regardless of immigration status—have been included in the country's official population counts."); Aaron Boyd, *How Census is Building a Citizenship Database Covering Everyone Living in the U.S.*, NEXTGOV (Apr. 1, 2020), https://www.nextgov.com/analyticsdata/2020/04/how-census-building-citizenship-database-covering-everyone-livingus/164275 (quoting former-Census official, "we won't know how accurate [the citizenship data models] are until well after the fact"); Michael Wines & Richard Fausset, *With Census Count Finishing Early, Fears of a Skewed Tally Rise*, N.Y. TIMES (Aug. 4, 2020), https://www.nytimes.com/2020/08/04/us/2020-census-ending-early.html (quoting former-Census Bureau directors warning that a December deadline would "result in seriously incomplete enumerations in many areas across our country").

[17]     *See, e.g.*, Michael Wines, *New Census Worry: A Rushed Count Could Mean a Botched One*, N.Y. TIMES (July 28, 2020), https://www.nytimes.com/2020/07/28/us/trump-census.html ("[T]he White House declined to address questions about its census plans.").

6.    ***The Defendants' Failures To Properly Respond To The FOIA Requests***

As of the filing of the present Motion, nearly three months after all of the FOIA Requests were submitted to the Defendants, none of the Defendants has produced even a single requested record to the Brennan Center, announced any determination as to how it will respond to the Request,[18] or even provided the Brennan Center with any indication as to when such records might be produced.  Grubow Decl. ¶¶ 7, 17, 22, 27, 32, 37, 42, 47, 51.  This is so even though the normal deadlines for each of the Defendant agencies to produce the requested records, even absent the expedition to which the Brennan Center is entitled, have all long passed.

As already noted, each of the Defendants has failed to properly respond to the Brennan Center's requests for expedited processing of the FOIA Requests, which were originally included in each of the FOIA Requests and renewed through the Supplemental Expedited Processing Letters that were sent to each Defendant by electronic mail on August 13, 2020.  Grubow Decl. ¶¶ 5, 15, 20, 25, 30, 35, 40, 45, 50.  The OLC, OAG, ODAG, OAAG, OLP, and Census Bureau all denied the original requests for expedition.  Grubow Decl. ¶¶ 13, 24, 29, 34, 39, 44; Dkt. 1, Exs. DD (OAG, ODAG, OAAG, OLP), EE (OLC), BB (Census Bureau).  The Department of Commerce and OMB never responded to the initial request for expedition.  Grubow Decl. ¶¶ 7, 51.  Only two agencies have responded to the Supplemental Expedited Processing Letters.  Grubow Decl. ¶¶ 21, 46; Dkt. 1, Exs. FF (OLC) & HH (Civil Rights Division).  Specifically, in response to the Letters,

---

[18]     On September 28, 2020, the DOJ's Office of Information Policy responded on behalf of the OAG, ODAG, OAAG, and OLP indicating that it was aggregating the four requests "to facilitate our records searches" and that OIP was "conducting a comprehensive records search." *See* Grubow Decl. ¶¶ 26 & Ex. JJ.  This response, however, is not a satisfactory "determination" for purposes of administrative exhaustion as outlined in *Citizens for Responsibility & Ethics in Washington v. Federal Elections Commission*, 711 F.3d 180, 186 (D.D.C. 2013) (requiring that "the agency must at least inform the requester of the scope of the documents that the agency will produce, as well as the scope of the documents that the agency plans to withhold under any FOIA exemptions").

the Civil Rights Division and OLC[19] granted the supplemental expedition requests, but only in name.  In actuality, neither of those Defendants has provided any indication of whether it will comply with the requests, let alone provided a timeline for when the Brennan Center can expect to begin receiving documents.  Dkt. 1, Exs. FF & HH.  The Department of Commerce, Census Bureau, OMB, OAG, ODAG, OAAG, and OLP have failed to respond at all to the Supplemental Expedited Processing Letters, further flouting their statutory obligations.  Grubow Decl. ¶¶ 7, 17 27, 32, 37, 42, 51.

**7.    *The Rapidly Dwindling Period In Which Disclosure Can Meaningfully Inform Public Discourse On Critically Important Government Decisions***

There are now *as few as three months* until the Department of Commerce delivers to the President the state-population totals that are to be used for reapportionment.  And as of the filing of this Motion, each Defendant stands in outright violation of its statutory obligation to either produce all non-exempt responsive records or to provide a lawful and reasoned basis for its withholding of any of them.

To ensure that access to the requested records is provided before the Administration's reapportionment calculation becomes a *fait accompli*, the Brennan Center has come to this Court. It has filed a five-count Complaint asking this Court to declare that the Defendants are in violation of their statutory obligations to properly and expeditiously respond to the FOIA Requests and to enjoin Defendants from further delay in producing responsive records.  And it is also filing the present Motion, which asks this Court to promptly enter a preliminary injunction compelling each of the Defendants to do each of the following within 30 days, *i.e.*, by November 2, 2020: (a)

---

[19]    The OLC had initially denied the request for expedition, Grubow Decl. ¶ 44; Dkt. 1, Ex. EE, but then granted the request after considering the Supplemental Expedited Processing Letter. Grubow Decl. ¶ 46; Dkt. 1, Ex. FF.  The Civil Rights Division granted the request after receipt of the Supplemental Expedited Processing Letter.  Grubow Decl. ¶ 21; Dkt. 1, Ex. HH.

complete its processing of the FOIA Request, (b) provide to the Brennan Center copies of all agency records responsive to the FOIA Request, except to the extent that the Defendant determines to withhold all or any portion of any such responsive record based upon a claim of an exemption from mandatory disclosure under the FOIA, and (c) serve on the Brennan Center and file with this Court a *Vaughn* Index setting forth, for each withheld portion of each responsive record (if any) that is not disclosed in full, (i) a detailed description of the withheld information and (ii) a detailed explanation of the Defendant's rationale for withholding such portion of the record.

The Brennan Center recognizes that this may be a challenging schedule for Defendants to meet given the unlawful delays that have already occurred.  But the high relevance of the requested records to imminent government actions that are of utmost importance to the nation's body politic warrants the government marshalling the personnel and resources necessary to meet this schedule, in order to ensure that the statutory goals of the FOIA are met and that the public interest is served.

## ARGUMENT

The FOIA provides this Court with ample authority to grant a preliminary injunction compelling an agency to expedite and complete processing of a FOIA request where the agency has delayed the processing and production of responsive records.  This Court also has the authority to establish a deadline for the production of requested records where, as here, the importance of access to the records is time-sensitive, such that some or all of their informative value to the public would be irretrievably lost if disclosure were delayed until it is too late for the information to affect an important government decision or action.  For the reasons set forth below, the Brennan Center is entitled to a preliminary injunction compelling all of the Defendants to expedite their responses to the FOIA Requests and to produce all non-exempt, responsive records within 30 days from the filing of the present motion, *i.e.*, by November 2, 2020.  In particular, the Brennan Center is likely

to succeed on the merits of its claims, the Brennan Center would be irreparably harmed absent a preliminary injunction, and the public interest in prompt disclosure of the records far outweighs any hardship to the Defendants that would result from their compliance with their statutory obligations.  Accordingly, the Court should grant the Brennan Center's motion for a preliminary injunction.

## I.   THIS COURT HAS JURISDICTION AND AUTHORITY TO GRANT THE REQUESTED INJUNCTIVE RELIEF

The FOIA provides this Court with jurisdiction and power to grant any and all necessary equitable or injunctive relief where an agency improperly delays the production of requested agency records.  5 U.S.C. § 552(a)(4)(B) (providing "jurisdiction to enjoin the agency from withholding agency records and to order the production of" improperly withheld records); *Elec. Privacy Info. Center v. Dep't of Justice*, 416 F. Supp. 2d 30, 35 (D.D.C. 2006) ("*EPIC*") ("FOIA imposes no limits on courts' equitable powers in enforcing its terms and unreasonable delays in disclosing non-exempt documents violate the intent and purpose of the FOIA, and courts have a duty to prevent such abuses.") (internal citation and quotation marks omitted).  This Court also has jurisdiction where agencies have denied or failed to respond in a timely manner to requests for expedited processing.  5 U.S.C. § 552(a)(6)(E)(iii) ("Agency action to deny … a request for expedited processing … and failure by an agency to respond in a timely manner … shall be subject to judicial review.").  Moreover, as none of the Defendants responded to the FOIA Requests within 20 working days of receiving them, nor within the additional 10 days that are generally allowed in certain unusual circumstances, the Brennan Center's administrative remedies are constructively exhausted, and the issues are ripe for judicial review.  *Id.* § 552(a)(6)(C)(i); *see also Oglesby v. Dep't of the Army*, 920 F.2d 57, 62 (D.C. Cir. 1990).

More specifically, this Court has the authority to issue a preliminary injunction ordering

an agency to expeditiously complete its processing of a FOIA request and disclose non-exempt responsive records where, as here, the agency has improperly denied or failed to respond to a request for expedited processing. *See Center for Pub. Integrity v. Dep't of Defense*, 411 F. Supp. 3d 5, 11, 15 (D.D.C. 2019) (granting a preliminary injunction ordering expedited processing and rolling record production within 17 to 25 days after the court's order where the Department of Defense had denied and OMB had failed to respond to requests for expedition).  The Court may preliminarily enjoin an agency that has purported to grant expedited processing of a FOIA request, but that has nonetheless failed to promptly produce the requested records, to further expedite its processing of the FOIA request. *See Protect Democracy Project v. Dep't of Defense*, 263 F. Supp. 3d 293, 297, 303 (D.D.C. 2017) (granting a preliminary injunction ordering expedited processing where three DOJ Components purported to grant expedited processing but did not expeditiously process the request); *EPIC*, 416 F. Supp. 2d at 37, 43 (ordering production or identification of requested records within 20 days and admonishing that an agency may not "drag its feet and 'pay lip service' to a requester's 'statutory and regulatory entitlement to expedition.'") (internal citation omitted).

Further, "relevant case law establishes that courts have the authority to impose concrete deadlines on agencies that delay the processing of requests meriting expedition." *EPIC*, 416 F. Supp. 2d at 38; *see also id.* at 35 (collecting cases).  In *EPIC*, for example, this Court required the Department of Justice to produce or identify all responsive records within 20 days or identify justification for withholding records within 30 days despite the complexity of the FOIA request at issue. *Id.* at 43.  The plaintiff in *EPIC* had requested documents related to the Bush Administration's warrantless surveillance program following the 9/11 terrorist attacks, some of which were classified. *Id.* at 34, 40.  The Court granted the plaintiff a preliminary injunction based

19

on its conclusion that time was of the essence because the requested records were needed to inform public debate in the lead up to congressional hearings on the wiretapping program. *Id.* at 34, 40–41.

This Court should do the same here, where an even greater urgency exists for obtaining records concerning the Administration's decision to exclude certain non-citizens from the state-population totals, or otherwise alter the reapportionment calculation, before reapportionment is finalized. If the public is not informed concerning the details of the Administration's actions and rationales well before the apportionment population counts are reported to the President, it will be irretrievably deprived of the opportunity to engage in well-informed discourse on the issues in advance of reapportionment, the consequences of which could linger for at least the next decade, during which at least two presidential elections, three federal mid-term elections, and numerous state and local elections will occur. The statutorily controlled nature of the apportionment process creates even greater urgency than was present in *EPIC*, because once the state-population counts are finalized, the reapportionment process becomes automatic. *See* 2 U.S.C. § 2a. The Commerce Department is currently planning to finalize the state-population totals used to calculate apportionment by the end of 2020. If disclosure does not occur well before that happens, the public would be unable to receive, digest, and debate information concerning an issue of highest national importance—one affecting fundamental issues of representation. That outcome would gravely impair the public's capacity to be a check against potential abuse of constitutional processes and to hold those in power accountable. *See NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).

II.   **THE BRENNAN CENTER IS ENTITLED TO A PRELIMINARY INJUNCTION COMPELLING EACH DEFENDANT TO PROVIDE A COMPLETE RESPONSE TO THE FOIA REQUESTS WITHIN THIRTY DAYS FROM THE FILING OF THIS MOTION**

A preliminary injunction compelling a federal agency to complete its response to a FOIA

request is appropriate and warranted "where the records are sought to inform an imminent public debate." *Center for Pub. Integrity*, 411 F. Supp. 3d at 10. "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (internal citation omitted). Where the Government is the opposing party, the final two factors for granting injunctive relief merge. *FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 127 (D.D.C. 2015) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "[T]he movant has the burden to show that all [] factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (internal citation and quotation marks omitted). As explained below, application of the factors in the present case warrants entry of a preliminary injunction compelling each Defendant to complete its processing and response to the Brennan Center's FOIA Requests by a date certain. *See Center for Pub. Integrity*, 411 F. Supp. 3d at 11.

### A.    The Brennan Center Is Likely To Succeed On The Merits

#### i.    *The Brennan Center Is Entitled To A Substantive Response To The FOIA Requests And Production Of Responsive Records*

The Brennan Center is entitled to a prompt determination on its FOIA Requests and, within 30 days of the filing of the present motion, the production of all non-exempt responsive records as well as a detailed index identifying and justifying the withholding of all responsive records that have not been produced. The FOIA unambiguously requires an agency determination within 20 working days on all FOIA requests that reasonably describe the requested agency records. 5 U.S.C. § 552(a)(6)(A)(i). If (and only if) an agency cites qualifying unusual circumstances, the agency is allowed up to, but generally no more than, an additional 10 days to complete its response. *Id.* § 552(a)(6)(B)(i)–(ii); *see also Judicial Watch, Inc. v. Dep't of Homeland Sec.*, 895 F.3d 770,

781 (D.D.C. 2018).   In addition, the Brennan Center is also entitled to a determination on its requests for expedited processing of its FOIA Requests within 10 calendar days, and, where a sufficient showing for expedition has been made, for the responsive records to be produced "as soon as practicable."  5 U.S.C. § 552(a)(6)(E).

The Brennan Center has submitted proper FOIA Requests to each of the Defendants and is entitled to all rights that the FOIA provides a requester.  A FOIA requester is entitled to have the requested records made "promptly available" as long as the request "reasonably describes" the records requested.   5 U.S.C. § 552(a)(3)(A).   The FOIA Requests at issue here more than reasonably describe the records sought as they provide detailed descriptions of the time frame, the persons/entities and topics of interests, and the types of records requested. *See, e.g.*, Dkt. 1, Ex. A.  Specifically, the time period for the records sought by the FOIA Requests is limited to June 27, 2019 to present. *Id.*  Further, the FOIA Requests plainly set forth four categories of agency records—each clearly describing the reapportionment topics at issue and suggesting terms and keywords that the agencies may use in conducting searches for responsive electronic and hard-copy records. *Id.*  Each FOIA Request also provides the Defendant agencies the names of particular persons and entities that are believed to have had relevant involvement in the matters at issue, further clarifying the scope and parameters of the requested records and offering further guidance for conducting searches. *Id.*  The FOIA Requests are discrete and clear; thus the Brennan Center has complied with all of the FOIA's requirements and is entitled to prompt production of all non-exempt responsive records.[20]  And because none of the Defendants has complied with its

---

[20]     One outlier among the Defendants, namely the Census Bureau, belatedly sent the Brennan Center a letter asserting that the FOIA Request it received—which is materially identical to the FOIA Requests sent to each of the other Defendants—needs to be clarified before the agency is obligated to respond to the Request. *See* Grubow Decl. ¶ 16; Dkt. 1, Ex. II.  The Census Bureau's

statutory obligations to make a timely determination regarding what documents to produce, and to produce all non-exempt responsive documents, the Brennan Center not only is likely to establish—but has already actually established—that each Defendant has violated its statutory obligations to appropriately respond to the FOIA Requests.

      *ii.*      *The Brennan Center Is Entitled To Expedited Processing Of The FOIA Requests On Two Independent Grounds*

The Brennan Center is also likely to prevail on its claims that each of the Defendants has violated its statutory and regulatory obligations to expedite its processing of, and responses to, the FOIA Requests.  Under the FOIA's provisions regarding when agencies must process FOIA requests even more quickly than the normal statutory timeframe, 5 U.S.C. § 552(a)(6)(E)(i), there are two independent grounds that mandate such expedition here.  First, each Defendant must process and respond to the FOIA Requests with special expedition pursuant to the applicable regulation that requires it to expedite FOIA requests that pertain to "[a] matter of widespread and exceptional … interest" as to which there are possible "questions" "about the [g]overnment's integrity."[21]  Second, there is an independent "compelling need" for expedition in this case because

---

position is wrong for the reasons set forth in text, and that conclusion is underscored by the fact that none of the other Defendants, during the months since they received the FOIA Requests, have even hinted that there is any issue regarding the reasonableness and clarity of the FOIA Requests. Indeed, the Office of Information Policy has indicated the FOIA Requests are more than sufficiently clear to begin conducting a comprehensive search, although they have not actually done so yet.  *See* Grubow Decl. ¶ 26 & Ex. JJ.

[21]      15 C.F.R. § 4.6(f)(1) (Department of Commerce and Census Bureau) ("Requests and appeals shall be taken out of order and given expedited treatment whenever it is determined that they involve: … (iii) [a] matter of widespread and exceptional media interest involving questions about the Government's integrity which affect public confidence…."); 28 C.F.R. § 16.5(e)(1) (DOJ) ("Requests and appeals shall be processed on an expedited basis whenever it is determined that they involve: … (iv) [a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence."); 5 C.F.R. § 1303.40(e)(1) (OMB) ("Requests and appeals will be given expedited treatment in cases where OMB determines: … (iv) [t]here are possible questions, in a matter of widespread and exceptional public interest, about the government's integrity which effect public confidence.").

there is "urgency to inform the public concerning actual or alleged Federal Government activity" and the requester, the Brennan Center, is "a person primarily engaged in disseminating information." 5 U.S.C. § 552(a)(6)(E)(v)(II). Each of these independent grounds for expedition was invoked and established both in the FOIA Requests themselves and in the Supplemental Expedited Processing Letters. And two of the Defendants, the Civil Rights Division and the OLC of the Department of Justice, have expressly granted the Brennan Center's request for expedition— the former based on the "primarily engaged in disseminating information ground," the latter without identifying the ground—although even those Defendants have failed to make good on that grant. Grubow Decl. ¶¶ 21, 46; Dkt. 1, Exs. FF, HH. In these circumstances, the Brennan Center is highly likely to prevail on the merits of its claims that all Defendants must expedite the processing of the FOIA Requests.

**The Exceptional Interest Ground For Expedition.** Expedition is required based on the "Exceptional Interest" ground where two elements exist: *first*, "widespread and exceptional" "media interest" and "public interest" in the information sought by the FOIA request; and *second*, related possible "questions about the [g]overnment's integrity which affect public confidence."[22] Another judge of this Court determined that "widespread and exceptional" interest had been established where at least a "handful of articles … [are] published in a variety of publications, and repeatedly reference the ongoing national discussion" on a topic to which the records relate. *Am. Civil Liberties Union v. Dep't of Justice*, 321 F. Supp. 2d 24, 32 (D.D.C. 2004) ("*ACLU*").[23]

---

[22]    15 C.F.R. § 4.6(f)(1)(iii); 28 C.F.R. § 16.5(e)(1)(iv); 5 C.F.R. § 1303.40(e)(1)(iv).

[23]    The DOJ has interpreted the exceptional interest grounds for expedition as requiring that "the same matter that draws widespread and exceptional media interest must [also] be the matter in which there exists possible questions about the Government's integrity that affect public confidence." *Oversight v. Dep't of Justice*, 292 F. Supp. 3d 501, 506 (D.D.C. 2018). Judge Leon accepted this interpretation. *Id.* Whether this interpretation has been adopted by the non-DOJ

Importantly, the regulatory requirement of related "questions" or "*possible* questions" about government integrity does not mean that any actual wrongdoing by the government needs to have been proven. *Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice*, 436 F. Supp. 3d 354, 361 (D.D.C. 2020) ("Neither FOIA nor the departmental regulations require the requester to prove wrongdoing by the government in order to obtain documents on an expedited basis.").

The Brennan Center has overwhelmingly established its entitlement to expedition based on the "Exceptional Interest" ground.  Indeed, one of the Defendants, the DOJ OLC, appears to have conceded that the FOIA Request satisfies the elements of this ground by granting the Brennan Center's request for expedition.  Grubow Decl. ¶ 46; Dkt. 1, Ex. FF.  *First*, the Brennan Center has shown that there is exceptional and widespread media and public interest in the reapportionment, including the Administration's potential use of citizenship data or other attempts to alter the 2020 Census state-population totals used for the reapportionment calculation.  Among other things, the FOIA Requests and Supplemental Expedited Processing Letters cited a sampling of more than 50 recent news articles on these topics published in a wide variety of national and local news outlets, including the Wall Street Journal, Fox News, the New York Times, the Washington Post, Politico, and NPR.  *See, e.g.*, Dkt. 1, Ex. J, at J-004–J-0012.  This demonstrated volume of media attention to the topics of the FOIA Requests far exceeds the mere "handful of articles" that another judge on this Court deemed sufficient to establish "exceptional and widespread" media or public interest for purposes of expedition.  *See ACLU*, 321 F. Supp. 2d at 32.

It is equally clear that the numerous media articles cited by the Brennan Center address matters directly related to the primary topic that the FOIA Requests seek to illuminate: namely,

---

Defendants here is of no import as the Brennan Center clearly satisfies the DOJ's heightened requirements.

the controversy surrounding the Administration's decisions to collect citizenship data in conjunction with the Census and to exclude certain non-citizens from the state-population totals to be used for the reapportionment count, including the potentially widespread and long-lasting repercussions of those decisions.  All of the cited articles were written between June 27, 2019 (the date of the Supreme Court's decision in *Department of Commerce v. New York*) and August 13, 2020 (the date the Supplemental Expedited Processing Letters were received by Defendants). Thirty-three were written within the several days following the publication of the Exclusion Memorandum and the Census Bureau's announcement it would reverse course on requesting a deadline extension.  For example, an article published by Politico described how "amid a renewed push by Trump to remove those in the country without documentation from the count" the Census Bureau announced the apportionment "data will be sent to the [P]resident by the end of the year."[24] Similarly, National Public Radio reported that "[t]hese last-minute changes to the constitutionally mandated count of every person living in the U.S. threaten the accuracy of population numbers used to determine the distribution of political representation and federal funding for the next decade."[25]  These articles and the many others cited in the Brennan Center's correspondence to the Defendants all establish that, dating back at least to the Supreme Court's 2019 decision and continuing through this day, there is extraordinarily intense media and public interest pertaining to the subject matter of the FOIA Requests.  The Defendant agencies here may not "turn a blind eye" to the "flurry of media attention" the topic of the FOIA Requests has received.  *ACLU*, 321 F. Supp. 2d at 32.

---

[24]     Steven Shepard, *Census Bureau Will Finish Count Earlier Than Expected, Deliver Data to Trump*, POLITICO (Aug. 3, 2020), https://www.politico.com/news/2020/08/03/census-bureau-data-trump-391146.

[25]     *See* Lo Wang, *Census Cuts All Counting Efforts Short By A Month*, *supra* note 6.

*Second*, the Brennan Center has likewise satisfied the other element of the Exceptional Interest ground for expedition—that the FOIA Requests at issue pertain to a topic in which there are possible questions about the government's integrity.  Indeed, its FOIA Requests and Supplemental Expedited Processing Letters not only explained how many of the cited articles raised possible questions about the government's integrity, but also categorized each of the articles according to the types of possible questions about integrity that are being raised.  Those highlighted categories are:

(1)      whether the government is acting unconstitutionally with respect to exclusion of certain non-citizens from the 2020 Census count;

(2)      whether the citizenship data the government plans to use to calculate the state-population totals used for reapportionment will be accurate; and

(3)      whether the 2020 Census count is being improperly politically influenced or lacks transparency.

*See, e.g.*, Dkt. 1, Ex. J, at J-004–J-0012.

Each of these categories of questions, and their prominence within the widespread recent media coverage cited by the Brennan Center, is more than sufficient to establish that the FOIA Requests pertain to possible questions concerning the 2020 Census that are about both the government's integrity and affect public confidence.  For example, articles published by USA Today and CNN quoted lawyers affiliated with prominent civil rights organizations calling the Exclusion Memorandum "blatantly unconstitutional"[26] and predicting that the Administration's "latest attempt to weaponize the census for an attack on immigrant communities will be found

---

[26]      *See, e.g.*, David Jackson, *Trump Tells Census to Not Count Undocumented People for Purposes of Deciding House Apportionment*, USA TODAY (July 21, 2020), https://www.usatoday.com/story/news/politics/2020/07/21/trump-tell-census-not-countundocumented-immigrants/5459873002.

unconstitutional."[27]  Similarly, the Wall Street Journal reported that U.S. Representative Carolyn Maloney, Chair of the House of Representative's Committee on Oversight and Government Reform, stated that "excluding undocumented immigrants from apportionment … departs from more than two centuries of practice and constitutional understanding."[28]  The significance to the public of these questions and concerns is underscored by the facts that a three-judge panel in the Southern District of New York recently declared that the Exclusion Memorandum was an "unlawful exercise of the authority granted to the President by statute,"[29] and that the government's challenge to that ruling is now before the Supreme Court.[30]

Many of the cited news reports also suggested that the data the Census Bureau is collecting for use in connection with the 2020 Census are likely to be flawed or incomplete.  One Fox News article, for example, explained that it is "not clear how the [A]dministration would determine who was in the country illegally" for purposes of calculating the state-population totals used for reapportionment.[31]  A National Public Radio story expressed concern about the Census Bureau's reversal of its decision to seek an extension of the relevant reporting deadlines during the current

---

[27]     Kevin Liptak, Maegan Vazquez, Ariane de Vogue & Catherine E. Shoichet, *Trump Signs Order Targeting Undocumented Immigrants in the US Census*, CNN (July 21, 2020), https://www.cnn.com/2020/07/21/politics/white-house-census-undocumented-immigrants/index.html.

[28]     Andrew Restuccia & Paul Overberg, *Trump Moves to Exclude Unauthorized Immigrants from Counts for Congressional Seats*, WALL ST. J. (July 21, 2020), https://www.wsj.com/articles/trump-moves-to-bar-who-are-people-in-u-s-illegally-from-being-counted-in-congressional-apportionment-11595352083.

[29]     *See New York v. Trump*, --- F. Supp. 3d ---, 2020 WL 5422959, at *2 (S.D.N.Y. Sept. 10, 2020).  The court "enjoin[ed] Defendants—but not the President himself—from including in the Secretary's report to the President any information concerning the number of aliens in each State 'who are not in a lawful immigration status under the Immigration and Nationality Act.'"

[30]     *Appeal docketed*, No. 20-366 (U.S. Sept. 22, 2020).

[31]     *See, e.g.*, Adam Shaw & John Roberts, *Trump Signs Order to Prevent Illegal Immigrants from Being Counted in Redrawing of Voting Districts*, FOX NEWS (July 21, 2020), https://www.foxnews.com/politics/trump-to-sign-order-illegal-immigrants-voting-districts.

pandemic, quoting a joint statement by four former Census Bureau Directors that this "will result in seriously incomplete enumerations in many areas across our country" and describing the Bureau's last minute changes as a "threat[] [to] the accuracy of population numbers used to determine the distribution of political representation."[32]  An academic article stated that "it is not clear whether the Secretary of Commerce could produce acceptable numbers of undocumented residents according to the timetable the new memorandum requires."[33]  And a news report in The Hill quoted both an immigration expert decrying the "questionable social science data techniques" being used by the Census Bureau and a Member of Congress describing the Exclusion Memorandum as a "blatant, backward attempt to depress the number of individuals who could participate in constitutionally-mandated population count" and an attempt by the Administration to "unlawfully sidestep" the Supreme Court ruling against adding a citizenship question to the 2020 Census.[34]

Finally, still other press reports cited by the Brennan Center to support its entitlement to expedition raised concerns about whether the 2020 Census is being improperly politically influenced, confirming that the "possible questions" to which the FOIA Requests pertain not only are "about government integrity," but also "affect public confidence."  One article published in Politico, for example, quoted former-Attorney General Eric Holder describing the Census

---

[32]     Lo Wang, *Census Cuts All Counting Efforts Short By A Month*, *supra* note 6.

[33]     Dudley L. Poston, Jr. & Teresa A. Sullivan, *Excluding Undocumented Immigrants from the 2020 U.S. House Apportionment*, UVA CTR. FOR POLITICS (July 30, 2020), http://centerforpolitics.org/crystalball/articles/excluding-undocumented-immigrantsfrom-the-2020-u-s-house-apportionment.

[34]     Brett Samuels & Rafael Bernal, *Trump Aims To Bar Undocumented Immigrants From Counting Toward House Representation*, HILL (July 21, 2020), https://thehill.com/latino/508314-trump-aims-to-bar-undocumented-immigrants-from-counting-toward-house-representation (suggesting that the Administration may be using sampling techniques which were struck down as by the Supreme Court in 1999 as a violation of Title 13).

Bureau's decision to exclude certain non-citizens from the state-population totals as "a partisan attempt at manipulating the census to benefit the [P]resident's allies."[35]  And an article published in the Washington Post raised concerns that two recent "high-level political appointees to the Census Bureau"—hired to fill newly created positions—"could attempt to influence the count."[36]  Statements like these affect public confidence, as it is self-evident that a government function such as the Census—which is designed to ensure equitable distribution of political power and public resources among the States—should be free from political interference.[37]

In these circumstances, the Brennan Center has plainly established that the FOIA Requests meet the standard pertaining to possible questions about government integrity that affect public confidence.  All of the above-referenced articles (and more) were in the administrative record before each Defendant when that Defendant either denied or failed to act upon the Brennan Center's supplemental request for expedition.  *See* 5 U.S.C. § 552(a)(6)(E)(iii).  And this administrative showing greatly exceeded the showing that another judge of this Court held in *ACLU* was sufficient to meet this standard.  In that case, the Court found that questions about government integrity affecting public confidence existed based upon an administrative record that included only a handful of news reports as a representative sample of the media attention, including two (one published in the San Francisco Chronicle and one in the Washington Post) regarding the "potential unconstitutionality" Section 215 of the Patriot Act.  *ACLU*, 321 F. Supp. 2d at 32.  The Court considered that the San Francisco Chronicle had highlighted proposed legislation,

---

[35]     Shepard, *supra* note 24.

[36]     Tara Bahrampour, *Trump Administration Seeks to Bar Undocumented Immigrants from a Portion of the 2020 Census*, WASH. POST (July 21, 2020), https://www.washingtonpost.com/ local/social-issues/trump-administration-seeks-to-bar-undocumented-immigrants-from-a-portion-of-the-2020-census/2020/07/21/9af682ee-c87f-11ea-a99f-3bbdffb1af38_story.html.

[37]     *See* Restuccia, *supra* note 28.

resolutions, and declarations, all in response to Section 215's potential unconstitutionality, and that the Washington Post had similarly emphasized that the public viewed Section 215 as an example of potential government abuse. *Id.* The articles, taken together, suggested Section 215 violated privacy rights raising serious questions about the government's integrity. *Id.* The showing of extraordinarily intense and sustained public interest in the present case, regarding one of the most fundamental constitutional processes of the Federal Government, far surpasses what was sufficient in *ACLU.*

In sum, the Brennan Center is highly likely to succeed on the merits of its claim of entitlement to expedited processing of its FOIA Requests on the ground of "Exceptional Interest" recognized in the regulations governing each of the Defendants.

**The Primarily Engaged In Dissemination Of Information Ground For Expedition.**

Expedition is independently required based on the "Primarily Engaged in Dissemination of Information" ground where two elements exist: *first*, the requester must be "primarily engaged in disseminating information," and *second*, there must be some "urgency to inform the public about actual or alleged government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II).[38] The Brennan Center and its FOIA Requests meet both of these prongs. And in fact, the Civil Rights Division of the DOJ admitted this in granting the Brennan Center's requests for expedition. Dkt. 1, Ex. HH, at HH-001; *see also* Dkt. 1, Ex. FF (Defendant OLC purportedly granting request for expedition without identifying its basis for doing so).

The Brennan Center easily satisfies both prongs of this test. *First*, as to being "primarily engaged in disseminating information," it is simply necessary for "information dissemination [to] be the main activity … of the requestor" and it is not necessary for information dissemination to

---

[38]    *See also* 15 C.F.R. § 4.6(f)(1)(iv); 28 C.F.R. § 16.5(e)(1)(ii); 5 C.F.R. § 1303.40(e)(1)(ii).

be the requester's "sole occupation."  *Protect Democracy Project*, 263 F. Supp. 3d at 298 (D.D.C.

2017) (citing *Progress v. Consumer Fin. Prot. Bureau*, 2017 WL 1750263 (D.D.C. May 4, 2017)

(quoting *Landmark Legal Found. v. Env't Prot. Agency*, 910 F. Supp. 2d 270, 276 (D.D.C. 2012))).

One of the Defendants (the DOJ Civil Rights Division) has already found that the Brennan Center

meets this requirement (as well as the urgency requirement).  Dkt. 1, Ex. HH, at HH-001.  That is

hardly surprising as the Brennan Center is a non-partisan law and public policy 501(c)(3)

organization that works to promote democracy and justice by, among other things, regularly

writing, publishing, and disseminating information on the decennial Census and corresponding

reapportionment.[39]  *See* Waldman Decl. ¶¶ 2–3, 7–8.  The Brennan Center also participates in

litigation, including cases brought for the purposes of securing a full, fair, and accurate decennial

census.  *Id.* ¶  3.  Indeed, the Brennan Center's mission is to be a "cutting-edge communications

hub, shaping opinion by taking [its] message directly to the press and public."[40]  *Id.*  Its analyses

and research have been cited by several national media outlets.  *Id.* ¶ 4.  Consistent with that

mission, the Brennan Center's free online library of articles contains thousands of publications and

reports, including over 40 items on the Census published since the June 2019 Supreme Court

decision in *Department of Commerce v. New York*.[41]  *Id.* ¶5.

　　　　Other judges of this Court have routinely held that organizations like the Brennan Center

---

[39]　　*See, e.g.*, Thomas Wolf, Kelly Percival & Brianna Cea, *Getting the Count Right: Key Context for the 2020 Census*, BRENNAN CENTER (March 31, 2020), https://www.brennancenter.org/sites/default/files/2020-03/CensusPrimer.pdf; Kelly Percival, *Strong Confidentiality Laws Protect All Data the Census Bureau Collects*, BRENNAN CENTER (Dec. 5, 2019), https://www.brennancenter.org/our-work/analysis-opinion/strong-confidentiality-laws-protect-all-data-census-bureau-collects.

[40]　　*Mission & Impact*, BRENNAN CENTER, https://www.brennancenter.org/about/mission-impact (last accessed September 28, 2020).

[41]　　*Library: A Fair & Accurate Census*, BRENNAN CENTER, https://www.brennancenter.org/library/?issue=22&subissue=60& (last accessed September 28, 2020).

that seek to promote democracy and justice through writing and publishing are "primarily engaged in disseminating information."   For example, in *Leadership Conference on Civil Rights v. Gonzales*, Judge Lamberth held that the requesters were primarily engaged in disseminating information because their "mission [was] to serve as the site of record for relevant and up-to-the minute civil rights news and information."   404 F. Supp. 2d 246, 260 (D.D.C. 2005); *see also Protect Democracy Project, Inc. v. Dep't of Defense*, 263 F. Supp. 3d 293, 298-300 (D.D.C. 2017) (holding that a non-profit organization was likely to prevail on the merits of its expedited processing claim where it intended "to disseminate the information obtained" and its "core mission … [was] to inform public understanding on operations and activities of government" and thus it likely established that it was "primarily engaged in disseminating information"); Waldman Decl. ¶¶ 5–8.

*Second*, as should be abundantly clear from the foregoing analysis of the "Exceptional Interest" ground for expedition (*supra*, at 24–31), there also exists an "urgency to inform the public concerning [the] actual or alleged Federal Government activit[ies]" that are the subject of the Brennan Center's FOIA Requests.   5 U.S.C. § 552(a)(6)(E)(v)(II).   And again, in granting the Brennan Center's request for expedition, the DOJ Civil Rights Division has already correctly recognized that the requisite urgency exists.  Dkt. 1, Ex. HH, at HH-001.

An urgency to inform the public exists where the "event[] at issue is the subject of a currently unfolding story" and the value of records to the public will be lost beyond a certain point in time.  *ACLU*, 321 F. Supp. 2d at 30 (citing *Al-Fayed v. Cent. Intel. Agency*, 245 F.3d 300, 310 (D.D.C. 2001)).   Here, the Administration's plans and actions with regard to the 2020 Census, including the impact of those actions on the American public, is a currently unfolding story as to which government action with significant consequences is imminent.   Ongoing, time-sensitive

activity concerning the 2020 Census presently includes: (1) implementation of Executive Order 13880, including data collection by the Census Bureau; and (2) Executive Branch activities in response to the Exclusion Memorandum and the undisclosed methodology by which the Administration will calculate apportionment.  All of this gives rise to great urgency to inform the public of the Administration's undisclosed motivations and undertakings well before actions with potentially material consequences, such as the Department of Commerce's delivery of the state-population totals to the President, occur.  The value to the public of the information sought by the FOIA Requests would be greatly diminished if its disclosure does not occur in time for the public to absorb, evaluate, and engage in well-informed debate on the appropriateness and legitimacy of such actions.

The "urgency" necessary for expedition has been found present in circumstances in which the relevant government activity is significantly less imminent than either the year-end deadline that the Administration has said it seeks to meet for the 2020 Census, or the April 30, 2021 deadline the Census Bureau indicated in April 2020 that it would need to produce accurate 2020 Census results.  For example, the Court in *Leadership Conference on Civil Rights v. Gonzales* found the urgency test satisfied and enjoined the agency to produce requested records concerning the Voting Rights Act no later than September 2006 where provisions of the Act were due to expire sometime in 2007.  404 F. Supp. 2d at 260.  In the present case, timing considerations create far greater urgency for two reasons: (1) the Administration is currently appealing a preliminary injunction in an attempt to maintain its plan to conclude Census data collection shortly and have the Department of Commerce transmit the 2020 Census state-population results to the President by the end of the year; and (2)  the Administration is now seeking expedited relief in the Supreme Court from the three-judge panel's decision enjoining the Administration from implementing the policies set forth

by the Exclusion Memorandum.[42]

Further, a "significant recognized interest" would be compromised, such that expedition is warranted under the "Primarily Engaged in Dissemination of Information" ground,  where a failure to order expedition would "preclude[ the public] … from obtaining in a timely fashion information vital to the current and ongoing debate surrounding the legality of a high-profile government action." *Protect Democracy*, 263 F. Supp. 3d at 300 (granting motion for preliminary injunction in part and ordering expedition of FOIA request for documents needed to inform public debate on legality of U.S. military strikes on Syrian government) (internal quotation omitted).  If the public is kept in the dark about the information sought by the Brennan Center for much longer, it will be completely shut off from informed debate about extraordinarily important government decisions and activities, depriving it of any meaningful opportunity to potentially effect a reversal of the Administration's plans before a reapportionment occurs that would have consequences for a decade.  In *Protect Democracy*, the Court found that the public's interest would be compromised if, due to a failure to expedite processing of a FOIA request, the public was not allowed to meaningfully question the legal justification for potentially recurring military strikes against a foreign government.  *Id.* at 299-300.  In this case, as in *Protect Democracy*, after the state-population count is delivered to the President by the Department of Commerce, "any damage will have been done."  *Id.* at 300.  Thus, the Brennan Center has satisfied the "urgency" prong of the "Primarily Engaged in Dissemination of Information" basis for expedition.

---

[42]    *See supra*, at 7, 28.  Before the Supreme Court, the Administration emphasized its own need for expedition, which underscores the urgency here.  The Administration argued that "[a]bsent some form of relief from the judgment [of the Southern District of New York], the Secretary and the President will be forced to make reports by the statutory deadlines that do not reflect the President's important policy decision concerning the apportionment."  Appellant's Motion for Expedited Consideration, *Trump v. New York*, 20-366 (U.S. Sept. 22, 2020).

As noted above, the Civil Rights Division of the Department of Justice concluded that the Brennan Center met the "Primarily Engaged in Dissemination of Information" prong's standard and granted the Brennan Center expedited processing of its FOIA Request.  Dkt. 1, Ex. HH, at HH-001.  And the OLC concluded that expedited processing was appropriate without specifying its basis for doing so.  Dkt. 1, Ex. FF, at FF-001.  Given that the FOIA Requests sent to the nine Defendants are materially identical, there is no logic by which the Civil Rights Division and OLC can grant expedition while other agencies, *including other offices and divisions of the Department of Justice*, reject it.  An absurd result would follow if agencies subject to the same standards were allowed to reach directly opposite results.  *See ACLU v. Dep't of Justice*, 321 F. Supp. 2d 24, 32-33 (D.D.C. 2004) (finding agency's denial of expedited processing unreasonable where agency had granted a similar request for expedition a year earlier).

*   *   *

In sum, as established above, the Brennan Center is likely to succeed on the merits of its claims in this case, including its claim for expedited processing of its FOIA Requests and its claims for declaratory and injunctive relief compelling the Defendants to promptly produce all non-exempt records that are responsive to those Requests.

**B.     The Brennan Center Would Be Irreparably Harmed Absent Issuance of the Requested Preliminary Injunction**

The record before this Court also establishes that the Brennan Center would suffer irreparable harm in the absence of a preliminary injunction compelling all Defendants to complete their processing of the FOIA Requests and production of all non-exempt responsive within thirty days of the filing of this motion.  As explained above, if the Defendant agencies fail to produce the requested records well in advance of any transfer of the state-population totals to the President, the Brennan Center would lose the ability to inform the public of the Administration's actions with

36

regard to the 2020 Census before the Census count is finalized by the Commerce Department and reported to the President.

Judges in this District have held that organizational plaintiffs similarly situated to the Brennan Center would be irreparably harmed where a delay in the production of records requested under the FOIA would prevent the organization from informing the public about important governmental activities in time for the public to engage in meaningful discourse about those activities.  For instance, in *Center for Public Integrity v. Dep't of Defense*, a public interest organization engaged in disseminating information to the public sought a preliminary injunction compelling the Department of Defense and OMB to produce records concerning the Ukraine Security Assistance Initiative at the center of the impeachment of President Trump.  411 F. Supp. 3d 5, 7 (D.D.C. 2019).  In granting the preliminary injunction—and ordering the requested records to be produced on a rolling basis in 17 to 25 days—Judge Kollar-Kotelly found that the plaintiff would be irreparably harmed by a delay in the production of records where the records requested would be used to "inform the public about matters relating to the impeachment proceeding." *Id.* at 12.  In so finding, the Court explained that "[i]f the requested information is released after the impeachment proceedings conclude, the information may still be of historical value.  However, for Plaintiff, the primary value of the information lies in its ability to inform the public of ongoing proceedings of national importance; and, in these circumstances, stale information is of little value." *Id.* (internal quotation omitted).

Judge Urbina reached the same conclusion in *Washington Post v. Dep't of Homeland Security*.  459 F. Supp. 2d 61 (D.D.C. 2006).  There, a newspaper sought visitor logs for the White House and the Vice President's Residence in advance of an upcoming congressional election. *Id.* at 64-65.  The newspaper argued that irreparable harm would occur if the public was deprived of

its ability "to make its views known in a timely fashion either at the polls, by lobbyists or through other contacts with public officials." *Id.* at 74–75 (internal quotation omitted).  The Court agreed, finding that the "likelihood for irreparable harm exists if the [newspaper's] FOIA request does not receive expedited treatment" because "its FOIA request is predicated on a matter of current national debate, due to the impending election." *Id.* at 75.  The Court granted the newspaper's motion for preliminary injunction, ordering "the defendant to complete the processing of the plaintiff's [] FOIA requests and produce or identify all responsive records within 10 days of the date of this opinion." *Id.* at 76.

Likewise, in *Electronic Privacy Info. Center v. Dep't of Justice* ("*EPIC*"), this Court found that the plaintiff would likely suffer irreparable harm if records it had requested under the FOIA concerning the Bush Administration's warrantless surveillance program were not produced in a timely fashion.  416 F. Supp. 2d 30, 40-41 (D.D.C. 2006).  Despite the fact that the Department of Justice had granted plaintiff's expedited processing request, the Court found that "[w]hat matters to [plaintiff] is not how the requests are labeled by the agency, but rather when the documents are actually released." *Id*.  The records plaintiff requested were "vital to the current and ongoing debate surrounding the legality of the Administration's warrantless surveillance program," such that if they were not timely produced, their value would be greatly diminished. *Id.*  In granting the preliminary injunction, the Court agreed that "the loss of that 'value' constitutes a cognizable harm," and ordered the Department of Justice to complete the processing of plaintiff's FOIA requests and produce or identify all responsive records within 20 days. *Id.* at 43.

The basis for finding likely irreparable injury absent a preliminary injunction is at least as strong in this case as it was in the *Center for Public Integrity*, *Washington Post*, and *EPIC* cases.  As the Administration seeks to deliver the state-population totals to be used to calculate

reapportionment to President Trump imminently—and as early as December 31, 2020—records must be produced as soon as possible lest they will become stale, and "stale information is of little value." *See American Oversight v. Dep't of State*, 414 F. Supp. 3d 182, 186 (D.D.C. 2019) (citing *Payne Enters., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988); *Elec. Frontier Found. v. Office of Dir. of Nat'l Intel.*, 2007 WL 4208311, at *7 (N.D. Cal. Nov. 27, 2007) ("[O]ngoing public and congressional debates about issues of vital national importance 'cannot be restarted or wound back.'") (internal citation omitted).   The public requires ample time to digest the information and fully engage in the current ongoing debate over the Administration's approach to the 2020 Census count and ensuing reapportionment calculation.  *See Washington Post*, 459 F. Supp. 2d at 74–75.  The Brennan Center, and the public more broadly, would be irreparably harmed if the records requested were not disclosed well in advance of the impending deadline; otherwise the records would be little more than artifacts of historical fancy.  Therefore, the potential harm to the Brennan Center is "certain and great" and would be "beyond remediation" if records are not produced by the beginning of November, which itself would leave less than two months before the time the Administration has indicated it would deliver apportionment data to the President if unconstrained by the current preliminary injunction in *National Urban League*.  *See Center for Public Integrity*, 411 F. Supp. 3d at 12 (citing *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).

Further augmenting the need for the requested documents to be disclosed very soon is the fact that it will take a significant amount of time not only for the Brennan Center to write and disseminate articles and analyses based on the documents, Waldman Decl. ¶ 7, but also for the public to read and digest that work product.  Even a production of all non-exempt responsive records by the date sought by this motion—*i.e.*, November 2, 2020—will cut the time for the

Brennan Center to write and publish about—not to mention the time for the public to absorb and then engage in debate about—those records so close to the Administration's desired time for reapportionment that at least some irreparable injury will be inevitable.  Nonetheless, to minimize such injury, the Court can and should adjudicate this motion and enter a preliminary injunction imposing that completion date.  While the Brennan Center recognizes this is ambitious, it is consistent with what other judges on this Court have ordered in cases where the grounds for expedition were substantially less compelling than they are here.  *See, e.g.*, *Washington Post*, 459 F. Supp. 2d at 76 (production within 10 days); *Center for Public Integrity*, 411 F. Supp. 3d at 15 (rolling production within 17-25 days); *EPIC*, 416 F. Supp. 2d at 43 (production or identification of responsive documents within 20 days).

Finally, establishing a very near-term deadline for all Defendants to submit a detailed *Vaughn* Index with respect to any and all withheld material is critical to avoiding (or at least minimizing) irreparable injury by helping to ensure that all responsive records that should be produced are in fact produced before it is too late.  The Administration's justifications for issuing the Exclusion Memorandum are hazy at best, and, as stated above, the Administration has declined to be transparent when approached by media with questions concerning the 2020 Census[43] and has resisted multiple court orders, including to produce documents.[44]  Against this background, the

---

[43]     *See* Hansi Lo Wang, *Do Trump Officials Plan to Break Centuries of Precedent in Divvying Up Congress?*, NPR (Aug. 14, 2019), https://www.npr.org/2019/08/14/749930756/do-trump-officials-plan-to-break-centuries-of-precedent-in-divvying-up-congress (reporting, nearly a year before the Exclusion Memorandum was released, that the Census Bureau failed to provide reporters with clear answers as to whether citizenship would be used in the 2020 Census or factor into apportionment).

[44]     *See* Mike Schneider, *Bureau Says 2020 US Census Will Actually End Oct. 5, Not End of October*, USA TODAY (Sept. 29, 2020), https://www.usatoday.com/story/news/nation/2020/09/29/2020-us-census-deadline-october-5-not-october-31-bureau-says/3570870001 (reporting that Secretary Ross will end the count on October 5, "despite a federal judge's ruling

Brennan Center has concerns that Defendants may seek to withhold some requested records, which the Brennan Center may continue to seek on the grounds that Defendants' assertions of exemption are unfounded.  A completion deadline of 30 days from the filing of the present motion, November 2, 2020, including for the submission of the *Vaughn* Index, will minimize irreparable injury by helping to ensure there is sufficient (albeit tight) time for the Court to adjudicate any withholding controversies, and to order production of any improperly withheld records, in time for the public to consider them before potentially irreversible actions relating to the reapportionment occur.

### C.     The Equities And The Public Interest Weigh Heavily In Favor Of Granting The Requested Preliminary Injunction

Requiring the Defendants to meet their statutory obligation will not cause any undue harm. *See Protect Democracy Project*, 263 F. Supp. 3d at 301 (quoting *Jacksonville Port. Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977) ("[T]here is an overriding public interest … in the general importance of an agency's faithful adherence to its statutory mandate.")).  Although the Brennan Center acknowledges the reality and effect of the global COVID-19 pandemic on working circumstances, the relief it requests in this motion allows for each agency to process and produce the requested records in more than double the time that is statutorily mandated even for FOIA requests for which, unlike those at issue here, special expedition is not required.[45]  Courts have previously found that where records' value would diminish after a pertinent date or event,

---

last week allowing the head count of every U.S. resident to continue through the end of October"); *see also* Hansi Lo Wang, *Court Order Keeps Census In Limbo As Counting End Date Looms*, NPR (Sept. 17, 2020), https://www.npr.org/2020/09/17/913364324/court-order-keeps-census-in-limbo-as-counting-end-date-looms (reporting that the "Justice Department attorneys missed a deadline for producing a complete record of internal Commerce Department documents for the lawsuit").

[45]     Congress allows for "unusual circumstances" to extend the deadline *only* for searching for records in other offices, examining voluminous records, or consulting with other agencies.  5 U.S.C. § 552(a)(6)(B)(iii)(I)–(III).  Even if the difficulties posed by COVID-19 cause some delay, they do not implicate unusual circumstances that trigger an additional ten days.

agencies' typical first-come-first-served practices may be avoided.  *See, e.g.*, *Center for Public Integrity*, 411 F. Supp. 3d at 14 ("[H]ardship on other FOIA requesters is not a bar to relief.").  And an order by the Court to prioritize the Brennan Center's request is appropriate because the Brennan Center has identified an imminent deadline by which the records requested would lose their value.  With the Census's imminent deadline fast approaching, this case presents an "extraordinary circumstance[]" that "warrant[s] [] line-cutting."  *Center for Public Integrity*, 411 F. Supp. 3d at 14.

In any event, even if the burden of requiring Defendants to comply with their statutory obligations were substantial, it would be far outweighed by the public interest in rapid disclosure of the requested records.  "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."  *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  Promptly releasing the records requested creates a "public benefit"—fulfilling FOIA's purpose—because the information "adds to citizens' knowledge" of the government's actions.  *See Center to Prevent Handgun Violence v. Dep't of Treasury*, 49 F. Supp. 2d 3, 5 (D.D.C. 1999).  The Brennan Center has demonstrated that expeditious disclosure of the records at issue here is vital for the public to better understand and engage in informed discussion and debate about the Administration's decision to exclude certain non-citizens from the state-population totals used to calculate reapportionment.  Reapportionment significantly impacts every person in the United States and occurs only once a decade.  The requested records must be produced immediately or else the public would face grave harm to its ability to assess the integrity of the Administration's choices and actions.  Therefore, the public interest in these records overwhelmingly outweighs any burdens that the requested injunction may impose on the Defendants.

## **CONCLUSION**

For the foregoing reasons, the Brennan Center has established an entitlement to a preliminary injunction compelling each of the Defendants to do each of the following within 30 days of the filing of the present motion, *i.e.*, by November 2, 2020: (a) complete its processing of the FOIA Request, (b) provide to the Brennan Center copies of all agency records responsive to the FOIA Request, except to the extent that the Defendant determines to withhold all or any portion of any such responsive record based upon a claim of an exemption from mandatory disclosure under the FOIA, and (c) serve on the Brennan Center and file with this Court a *Vaughn* Index setting forth, for each withheld portion of each responsive record (if any) that is not disclosed in full, (i) a detailed description of the withheld information and (ii) a detailed explanation of the Defendant's rationale for withholding such portion of the record.

Dated: October 2, 2020

Respectfully submitted,

 /s/ Patrick J. Carome
Patrick J. Carome (D.C. Bar No. 385676)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000
Patrick.Carome@wilmerhale.com

Jared V. Grubow*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
Jared.Grubow@wilmerhale.com

*Pro hac vice*

Caitlin W. Monahan*
Mikayla C. Foster*
Rieko H. Shepherd*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
Caitlin.Monahan@wilmerhale.com
Mikayla.Foster@wilmerhale.com
Rieko.Shepherd@wilmerhale.com

*Counsel for Plaintiff the Brennan Center for
  Justice at NYU School of Law*

43

## CERTIFICATE OF SERVICE

I, Patrick J. Carome, hereby certify that on October 2, 2020, a true and correct copy of the foregoing document was filed electronically with the United States District Court for the District of Columbia.  Notice of this filing has been sent by Federal Express overnight mail to the following parties:

UNITED STATES DEPARTMENT OF
  COMMERCE,
  1401 Constitution Ave NW
  Washington, DC 20230,

UNITED STATES CENSUS BUREAU,
  4600 Silver Hill Road
  Washington, DC 20233,

CIVIL RIGHTS DIVISION,
U.S. DEPARTMENT OF JUSTICE,
  950 Pennsylvania Ave, NW
  Office of the Assistant AG, Main
  Washington, DC 20530,

OFFICE OF THE ATTORNEY
  GENERAL,
  U.S. DEPARTMENT OF JUSTICE,
  950 Pennsylvania Ave, NW
  Office of the Assistant AG, Main
  Washington, DC 20530,

OFFICE OF THE ASSOCIATE
  ATTORNEY GENERAL,
  U.S. DEPARTMENT OF JUSTICE,
  950 Pennsylvania Ave, NW
  Office of the Assistant AG, Main
  Washington, DC 20530,

OFFICE OF THE DEPUTY ATTORNEY
  GENERAL,
  U.S. DEPARTMENT OF JUSTICE,
  950 Pennsylvania Ave, NW
  Office of the Assistant AG, Main
  Washington, DC 20530,

OFFICE OF LEGAL COUNSEL,
  U.S. DEPARTMENT OF JUSTICE,
  950 Pennsylvania Ave, NW
  Office of the Assistant AG, Main
  Washington, DC 20530,

OFFICE OF LEGAL POLICY,
  U.S. DEPARTMENT OF JUSTICE,
  950 Pennsylvania Ave, NW
  Office of the Assistant AG, Main
  Washington, DC 20530,

OFFICE OF MANAGEMENT AND
  BUDGET
  725 17th Street NW, Suite 9204
  Washington, DC 20503,

*Defendants*

_/s/ Patrick J. Carome_____
Patrick J. Carome