**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW,

       *Plaintiff,*

   v.

DEPARTMENT OF COMMERCE *et al.*,

       *Defendants.*

Civil Action No. 20-2674 (TJK)

## MEMORANDUM OPINION

The Brennan Center filed this FOIA action in late September 2020, requesting the production of records responsive to requests it sent to nine federal agencies in early July.  The records it seeks relate to the 2020 United States census, including the methodology used to calculate and report state-population totals, the potential use of citizenship status data in those calculations, and how the calculations will be used to reapportion the House of Representatives—*i.e.,* how many seats in that body the House will inform each state it is entitled to for the next ten years, as it must by January 25, 2021.  Just over a week after filing its complaint, the Brennan Center filed the instant motion for a preliminary injunction.  The motion seeks to compel the agencies to expedite processing of its requests, and, on top of that, to do so (and provide it a *Vaughn* index) by November 2, 2020.  It is rare that *any* preliminary relief is appropriate in a FOIA case, but this is not a run-of-the-mill case.  For the reasons explained below, the Court will grant the motion for preliminary injunction in part and require Defendants to process most of the Brennan Center's requests and produce *Vaughn* indices on a rolling basis to be completed by January 11, 2021, in time for the Brennan Center to make use of the records by January 25, 2021.

I.      **Background**

      A.      **The Freedom of Information Act**

The Freedom of Information Act (FOIA) requires agencies to make records "promptly available to any person" whose request "reasonably describes such records" and otherwise satisfies agency procedures.  5 U.S.C. § 552(a)(3)(A).  Within twenty business days of receiving a request, a period that an agency may extend for ten days in "unusual circumstances," 5 U.S.C. § 552(a)(6)(B)(i), the agency must determine "whether to comply with such request" and "immediately notify the person making such request" of "such determination and the reasons therefor" and of "the right of such person to appeal to the head of the agency any adverse determination," 5 U.S.C. § 552(a)(6)(A)(i).  Then, responsive, non-exempt records "shall be made promptly available to such person making such request."  5 U.S.C. § 552(a)(6)(C)(i).

A person who "demonstrates a compelling need" or falls within "other cases determined by the agency" is entitled to expedited processing of his request.  5 U.S.C. § 552(a)(6)(E)(i)(I)–(II).  There are two potential bases for expedited processing at issue here.  A requester is entitled to expedited processing if he can show that (1) the requests concern "[a] matter of widespread and exceptional . . . interest" that raises "questions" "about the Government's integrity" that "affect public confidence," 5 C.F.R. § 1303.40(e)(1)(iv); 15 C.F.R. § 4.6(f)(1)(iii); 28 C.F.R. § 16.5(e)(1)(iv); or (2) the requester is "primarily engaged in disseminating information," and there is "urgency to inform the public concerning actual or alleged Federal Government activity," 5 U.S.C. § 552(a)(6)(E)(v)(II); 5 C.F.R. § 1303.40(e)(1)(ii); 15 C.F.R. § 4.6(f)(1)(iv); 28 C.F.R. § 16.5(e)(ii).  If a request is entitled to expedited processing, the agency must process it "as soon as practicable."  5 U.S.C. § 552(a)(6)(E)(iii).

B.        **The 2020 United States Census and Related Statutory Deadlines**

The Constitution requires that a census be conducted every ten years "in such Manner as [Congress] shall by Law direct" to reapportion the number of seats allocated to each state in the House of Representatives.  U.S. Const., art. I, § 2, cl. 3.  The state-population totals are also used "to allocate federal funds to the States and to draw electoral districts."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2561 (2019).  Congress has delegated the taking of the census to the Secretary of Commerce "in such form and content as he may determine," 13 U.S.C. § 141(a), and established certain statutory deadlines governing the reapportionment process that are relevant here.  The Secretary must report state-population totals to the President "within 9 months after the census date," 13 U.S.C. § 141(b), in this case by December 31, 2020.  Then, "[o]n the first day, or within one week thereafter" of the first regular session of each fifth Congress (here, by January 10, 2021) the President must submit the reapportionment data—"the whole number of persons in each State . . . and the number of Representatives to which each State would be entitled"—to Congress.  *See* 2 U.S.C. § 2a(a); Tr. at 5.[1]  Finally, within "fifteen calendar days after the receipt of such statement," here by January 25, 2021, the Clerk of the House of Representatives must "send to the executive of each State a certificate of the number of Representatives to which such State is entitled."  *See* 2 U.S.C. § 2a(b); Tr. at 41.[2]

C.        **Events Surrounding the 2020 United States Census**

The FOIA requests at issue relate to several events concerning the timing and content of this year's census.  In 2018, the Secretary of Commerce announced that the 2020 census

---

[1] Citations to the hearing on the Brennan Center's motion are to page numbers in a "rough" transcript because the final, certified transcript is not yet available.

[2] In addition, "within one year after the decennial census date," in this case, by April 1, 2021, Commerce must provide detailed population data broken down by geographic area to the states for redistricting purposes.  13 U.S.C. § 141(c); Tr. at 41.

questionnaire would include a citizenship question.  ECF No. 1 ("Compl.") ¶ 31; *Dep't of Commerce v. New York*, 139 S. Ct. at 2562.  But in June the year after, the Supreme Court set aside that decision, effectively precluding use of the question on the questionnaire.  Compl. ¶ 31; *Dep't of Commerce v. New York*, 139 S. Ct. at 2576.  The next month, the President issued Executive Order 13880, instructing agencies to provide the Secretary "the maximum assistance permissible, consistent with law, in determining the number of citizens and non-citizens in the country, including by providing any access that the Department may request to administrative records that may be useful in accomplishing that objective."  Compl. ¶ 32; 84 Fed. Reg. 33,821 (July 11, 2019).  And about a year later, in July 2020, the President issued a "Memorandum on Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census" to the Secretary.  Compl. ¶ 29; 85 Fed. Reg. 44,679 (July 23, 2020).  The memorandum established that "it is the policy of the United States to exclude from the apportionment base aliens who are not in a lawful immigration status," and directed the Secretary, in preparing his report of state-population totals for the President, "to provide information" permitting him to carry out that policy.  *Id.* at 44,680.  In September, a three-judge district court in the Southern District of New York found the memorandum an unlawful exercise of the President's statutory authority and enjoined the Secretary from providing the President that information.  *New York v. Trump*, No. 20-CV-5770 (RCW) (PWH) (JMF), 2020 WL 5422959 (S.D.N.Y. Sept. 10, 2020).  The Supreme Court will hear argument on an expedited appeal of that decision on November 30.  *Trump v. New York*, No. 20-366 (U.S. Oct. 16, 2020).

In addition, because of complications from the COVID-19 pandemic, in April 2020 the Census Bureau announced that it would seek from Congress a four-month delay in the statutory deadlines for this year's census, which would have extended the Secretary's deadline to report

state-population totals to the President to April 30, 2021.  Compl. ¶ 26; *Statement on 2020*

*Census Operational Adjustments Due to COVID-19*, Release No. CB20-RTQ.16 (Apr. 13, 2020),

https://2020census.gov/en/news-events/press-releases/statement-covid-19-2020.html?linkId=

10000001175162.  But in early August 2020, shortly after the President issued the memorandum

on excluding unlawful aliens from the state-population totals used for reapportionment, the

Census Bureau reversed course and announced it would no longer seek such a delay.  Compl.

¶ 28; *Statement from U.S. Census Bureau Director Steven Dillingham: Delivering a Complete*

*and Accurate 2020 Census Count*, Release No. CB20-RTQ.23 (Aug. 3, 2020),

https://www.census.gov/newsroom/press-releases/2020/delivering-complete-accurate-

count.html.  At the same time, the Census Bureau announced that it would end field data

collection by September 30, a month earlier than the three-month extension it had previously

planned to account for the pandemic.  *See id.*  A few days before that deadline, a district court in

the Northern District of California granted a preliminary injunction enjoining the shorter

deadline.  *Nat'l Urban League v. Ross*, No. 20-CV-05799-LHK, 2020 WL 5739144 (N.D. Cal.

Sept. 24, 2020).  But in October, the Supreme Court, by staying the injunction pending appeal,

effectively permitted data collection to end as the Census Bureau had announced.  *Ross v. Nat'l*

*Urban League*, No. 20A62, 2020 WL 6041178 (U.S. Oct. 13, 2020).

    **D.**    **The Brennan Center's FOIA Requests and The Instant Lawsuit**

    In early July 2020, the Brennan Center for Justice at NYU School of Law (the "Brennan

Center") submitted the same FOIA request to nine federal agencies: the Department of

Commerce, the Civil Rights Division of the Department of Justice, the Office of Legal Counsel

(OLC), the Census Bureau, the Office of the Attorney General, the Office of the Deputy

Attorney General (ODAG), the Office of the Associate Attorney General (OAAG), the Office of

Legal Policy (OLP), and the Office of Management and Budget (OMB).  Compl. ¶¶ 37–45.  The

Brennan Center's request consisted of the following parts:

> [Part 1] All records created on or after June 27, 2019, pertaining to
> how any of the citizenship-status data collected pursuant to
> Executive Order 13880 can, could, should, or may be used,
> incorporated, referenced, or considered in any of the following
> activities:
>
> - calculating or otherwise formulating the 2020 total national
>   population;
> - calculating or otherwise formulating the 2020 state-population
>   totals to be used to apportion the United States House of
>   Representatives as contemplated by 13 U.S.C. § 141(b)
>   (hereinafter, the "2020 state-population totals");
> - reporting the 2020 state-population totals to President Trump
>   by the Secretary of Commerce as required under 13 U.S.C. §
>   141(b);
> - reporting by President Trump to Congress the 2020 state-
>   population totals and number of congressional representatives
>   to which each state is entitled, as required under 2 U.S.C. §
>   2a(a);
> - changing the Census Bureau's policy for calculating the 2020
>   state population totals, which currently states the 2020 state-
>   population totals will be calculated using the Census Unedited
>   File;
> - changing the Census Bureau's policy for creating the Census
>   Unedited File, which currently states the Census Unedited File
>   will not contain any citizenship status data.
>
> [Part 2] All records created on or after June 27, 2019, pertaining to
> the process by which the Secretary of Commerce will report the
> 2020 state-population totals to President Trump, as required under
> 13 U.S.C. § 141(b).
>
> [Part 3] All records created on or after June 27, 2019 pertaining to
> the process by which President Trump will report to Congress the
> 2020 state-population totals and number of congressional
> representatives to which each state is entitled thereunder, as
> required under 2 U.S.C. § 2a(a).

Compl. ¶ 46; Compl. Exs. A–I.  The Brennan Center also requested, as Part 4 of its requests,

records "relating to the 2020 Census" to the extent "there is any mention of, involvement in, or

communication with" a list of individuals and organizations the Brennan Center believes may have been involved in the matters covered by Parts 1–3.  Compl. ¶ 47; Compl. Exs. A–I.  None of Defendants granted the Brennan Center's original expedition requests: six affirmatively denied them, while two never responded.  ECF No. 13 ("Grubow Decl.") ¶¶ 7, 13, 24, 29, 34, 39, 44, 49; Compl. Exs. BB, DD, EE, GG.  One month later, the Brennan Center sent supplemental letters supporting its requests for expedited processing.  Compl. ¶ 50; Compl. Exs. J–R.  The Civil Rights Division and OLC granted the requests.  Grubow Decl. ¶¶ 21, 46; Compl. Exs. FF, HH.  Still, by mid-September, Defendants had produced no documents to the Brennan Center.  Compl. ¶ 5.

The Brennan Center filed this suit on September 21, 2020, and its Motion for Preliminary Injunction on October 2, 2020.  In its motion, the Brennan Center seeks a preliminary injunction ordering Defendants to complete processing of all its FOIA requests, produce responsive non-exempt records, and serve a *Vaughn* index that details any withheld information and the exemptions claimed as the bases for withholding, all by November 2, 2020.  ECF No. 12 at 16–17.  The Court adopted the parties' joint briefing schedule and held a hearing on the motion on October 23, 2020.  By then, Defendants had agreed to expedited processing of the Brennan Center's requests, with three exceptions.  Tr. at 25.  OMB had not responded to the request, and the Census Bureau and Department of Commerce had agreed to expedite Parts 1–3 of the request only.[3]  *Id.*  The Civil Rights Division specified the basis on which it granted the request—the "urgency to inform the public" ground—but no other agency did so.  *See* ECF No. 20-4 ("Kagle Decl.") at 50.

---

[3] *See* ECF No. 20-3 ("Curry Decl.") ¶¶ 13–14; ECF No. 21-1 ("Walsh Decl.") ¶ 9.

At the hearing, Defendants provided updates as to their processing of the requests: the Office of Information Policy (which processes requests received by OAG, ODAG, OAAG, and OLP) anticipates processing documents found during an initial search by October 30, but it estimates that full searches will not be completed until November 13, Tr. at 48–49; the Civil Rights Division located about 1,300 potentially responsive records and will process 300 documents per month, Tr. at 50; OMB has not yet conducted searches—and so does not know the number of potentially responsive documents—but can process 300 documents per month, Tr. at 50–51; the Department of Commerce located around 2,200 potentially responsive email threads with 6,300 attachments relating to Parts 1–3 of the request and 16,000 documents as to Part 4, and estimated that it could process 500 records per month, Tr. at 51–52; and the Census Bureau does not have an estimate as to the total number of responsive documents it may possess but can process 500 records per month, Tr. at 52.  The Brennan Center reached an agreement with OLC regarding the processing of its request and accordingly it no longer seeks preliminary injunctive relief as to OLC.  Tr. at 2–3.

## II.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right," and only "upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22, 24 (2008).  A plaintiff seeking such relief "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id.* at 20.  "[P]laintiffs bear the burden of persuasion on all four preliminary injunction factors in order to secure such an 'extraordinary remedy.'"  *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014).

Before the Supreme Court's decision in *Winter*, courts weighed the preliminary injunction factors on a sliding scale, allowing a weak showing on one factor to be overcome by a strong showing on another factor. *See Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 360-61 (D.C. Cir. 1999). This Circuit, however, has suggested, without deciding, that *Winter* should be read to abandon the sliding-scale analysis in favor of a "more demanding burden" requiring plaintiffs to independently show both a likelihood of success on the merits and irreparable harm. *See Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009). In any event, without a likelihood of success on the merits, a plaintiff is not entitled to a preliminary injunction regardless of their showing on the other factors. *See Ark. Dairy Coop Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009). And "it is clear that failure to show a likelihood of irreparable harm remains, standing alone, sufficient to defeat the motion." *Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018); s*ee also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief.").

## III.   Analysis

### A.   Likelihood of Success on the Merits

The Brennan Center seeks a preliminary injunction compelling both (1) expedited processing of its FOIA requests and (2) completion of that process and *Vaughn* indices by a date certain, November 2, 2020. Thus, it must show a likelihood of success both that (1) under the statute, it is "entitled to *expedited* processing and not just whether it is entitled to a response," *Ctr. for Public Integrity v. Dep't of Defense*, 411 F. Supp. 3d 5, 11 (D.D.C. 2019) (quoting *Landmark Legal Found. v. EPA*, 910 F. Supp. 2d 270, 274 (D.D.C. 2012)); and (2) under the

circumstances, processing must be completed by the specific date in question, *Protect Democracy Project, Inc. v. Dep't of Defense*, 263 F. Supp. 3d 293, 301 (D.D.C. 2017).

Under the statute, a party seeking expedited FOIA processing must establish a "compelling need" or show that he qualifies under another ground set out by the relevant agency for such treatment.  5 U.S.C. § 552(a)(6)(E)(i)(I)–(II).  The Brennan Center here raises two potentially applicable grounds for expedition, ECF No. 12 at 23–24: that (1) its requests concern "[a] matter of widespread and exceptional . . . interest" that raises "questions" "about the Government's integrity" that "affect public confidence," 5 C.F.R. § 1303.40(e)(1)(iv); 15 C.F.R. § 4.6(f)(1)(iii); 28 C.F.R. § 16.5(e)(1)(iv); and (2) it is "primarily engaged in disseminating information" and there is "urgency to inform the public concerning actual or alleged Federal Government activity," 5 U.S.C. § 552(a)(6)(E)(v)(II).  If a request is entitled to expedited treatment, the agency must process it "as soon as practicable."  5 U.S.C. § 552(a)(6)(E)(iii).

### 1.    Expedited Processing

The Brennan Center has established a likelihood of success that its requests are entitled to expedited processing based on either the "widespread and exceptional interest" or the "urgency to inform the public" ground.  This conclusion largely comports with how, as already described, Defendants are now treating its requests.  All but one of Defendants—OMB, which has apparently still not responded—have granted expedited processing to all or most of the requests. Tr. at 25.

### a.    "Widespread and Exceptional Interest"

First, the Brennan Center has shown a likelihood of success on the merits of the "widespread and exceptional interest" ground for expedited processing its requests.  To warrant expedition on this basis, the requestor must show "widespread and exceptional" media or public interest in the records sought and that the subject matter raises possible "questions" about the

"Government's integrity" that "affect public confidence," *see* 5 C.F.R. § 1303.40(e)(1)(iv); 15 C.F.R. § 4.6(f)(1)(iii); 28 C.F.R. § 16.5(e)(1)(iv).  The Brennan Center's submissions to the agencies cite more than fifty recent articles from a variety of sources on the census, reapportionment, and the potential use of citizenship data in this process, ECF No. 12 at 25, considerably more than has sufficed in other cases, *see Am. Civil Liberties Union v. Dep't of Justice*, 321 F. Supp. 2d 24, 32 (D.D.C. 2004) ("a handful of articles").  Moreover, these articles raise questions about "the Government's integrity," which need not suggest any dishonesty or intentional wrongdoing on Defendants' part.  The articles address, for example, whether the Census Bureau's calculation of the state-population totals will be accurate, given the challenges of the COVID-19 pandemic, the Census Bureau's withdrawal of its request to Congress to extend the relevant statutory deadlines and its decision to end field data collection earlier than anticipated, and even the difficulties in determining individuals' immigration status.  ECF No. 12 at 27–28; *see* Integrity, Black's Law Dictionary (11th ed. 2019) (defining "integrity" to include "soundness"); Integrity, American Heritage Dictionary (5th ed. 2018) (same).  They also concern whether its methods for determining apportionment, including the use of citizenship data, are lawful.  *See Am. Civil Liberties Union*, 321 F. Supp. 2d at 32 (finding questions regarding government integrity where articles reported concerns regarding law's "potential unconstitutionality").

Defendants do not contest the Brennan Center's assertion of this ground as to Parts 1–3 of their request; they only contest it as to Part 4.  That part seeks records "relating to the 2020 Census" to the extent "there is any mention of, involvement in, or communication with" a list of individuals and organizations the Brennan Center believes may have been involved in the matters covered by Parts 1–3.  Compl. Exs. A–I.  Specifically, Defendants argue that this request

is "far broader" than any "widespread and exceptional" interests at stake.  *See* ECF No. 20 at 17.

The Court disagrees.  Although this part will capture a broader set of documents, it still seeks

records "relating to the 2020 Census," which, as explained above, includes matters "of

widespread and exceptional interest" that raise "questions" about "the Government's integrity."

Moreover, in most cases, the Brennan Center links these individuals and organizations with

advocacy or involvement relating to the areas covered by Parts 1–3 of its requests.[4]  *See* ECF No.

22 at 10–11 & n.5.  Thus, the Brennan Center has satisfied its burden of showing a likelihood of

success that Part 4 of its requests, as well as Parts 1–3, is entitled to expedited processing under

the regulations' "widespread and exceptional interest" ground.

### b.    "Urgency to Inform the Public"

The Brennan Center has also shown a likelihood of success on the merits of the "urgency

to inform the public" ground for expedited processing of all parts of its requests.  A requestor

meets the statutory requirements for expedition on this basis if it is a person or entity "primarily

engaged in disseminating information," and there is "urgency to inform the public concerning

actual or alleged Federal Government activity."  5 U.S.C. § 552(a)(6)(E)(v).

The Brennan Center asserts that it is primarily engaged in dissemination of information

as "a non-partisan law and public policy" group that "regularly writ[es], publish[es], and

disseminat[es] information" and maintains an online library of thousands of articles, including

over forty articles about the census.  ECF No. 12 at 32.  Defendants do not dispute the Brennan

Center's status as an organization "primarily engaged in disseminating information," ECF No. 20

at 18–19, and other courts have found that similar organizations meet this standard, *see Protect*

---

[4] As for those handful of individuals and organizations for which the Brennan Center fails to make such a showing, it has probably not made out a sufficient case for expedition.  However, because the Court denies preliminary injunctive relief related to Part 4 on other grounds, it need not press this point.

*Democracy Project*, 263 F. Supp. 3d at 298–300; *Leadership Conf. on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 260 (D.D.C. 2005).

The Brennan Center has also shown a likelihood of success on the second element of this ground, that there is "urgency to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v). The D.C. Circuit has instructed that this element requires that (1) "the request concerns a matter of current exigency to the American public"; (2) "the consequences of delaying a response would compromise a significant recognized interest"; and (3) "the request concerns federal government activity." *Am. Civil Liberties Union*, 321 F. Supp. 2d at 30 (citing *Al-Fayed v. C.I.A.*, 254 F.3d 300, 310 (D.D.C. 2001)). In other words, the "event[] at issue" must be "the subject of a currently unfolding story." *Id.* Here, the 2020 census and reapportionment processes are currently unfolding stories about federal government activity that are now the subject of public debate and discussion, but they will largely conclude early next year. Thus, delay would compromise the Brennan Center's significant interest in "inform[ing] the public concerning actual or alleged Federal Government activity" related to the 2020 census and reapportionment.

Defendants argue that the Brennan Center has not demonstrated there is "urgency to inform the public concerning actual or alleged Federal Government activity" because the Brennan Center did not make its requests earlier, closer to when the President issued Executive Order 13880 in July 2019. ECF No. 20 at 18. But the Court declines to weigh this timing against the Brennan Center. As the Brennan Center points out, if it had requested records shortly after the President issued that order, few responsive records would have existed. And nothing in the record suggests that the Brennan Center would have received expedited treatment a year ago and be much closer to receiving the records at issue had it requested them then.

### 2.    Date Certain

But to win all the preliminary relief it asks for, the Brennan Center must do more than just show a likelihood of success that it is entitled to the expedited processing of its requests.  It must show a likelihood that it is entitled to have processing finished, and *Vaughn* indices produced, by November 2, 2020.  *Protect Democracy Project*, 263 F. Supp. 3d at 301.  In other words, it must show that under the circumstances, "as soon as practicable," 5 U.S.C. § 552(a)(6)(E)(iii), means by that date.  The Court's analysis on this point tracks closely with its evaluation of irreparable harm, and it holds that the Brennan Center has not met its burden as to that date.

On a handful of occasions, courts in this District have required the government to process FOIA requests by a date certain.  *See, e.g., Am. Oversight v. Dep't of State*, 414 F. Supp. 3d 182, 185 (D.D.C. 2019); *Ctr. for Public Integrity*, 411 F. Supp. 3d at 15; *Wash. Post v. Dep't of Homeland Security*, 459 F. Supp. 2d 61, 76 (D.D.C. 2006).  They have done so to avoid the records requested becoming stale after that date, and thus being "of little value" to "inform the public of ongoing proceedings of national importance."  *Ctr. for Public Integrity*, 411 F. Supp. 3d at 12 (quoting *Payne Enters., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988)); *see also Wash. Post*, 459 F. Supp. 2d at 74.  Thus, under those circumstances, a plaintiff may demonstrate a likelihood that it is entitled to have processing completed quickly enough so that "the value of the information would not be lessened or lost."  *Ctr. for Public Integrity*, 411 F. Supp. 3d at 12.

But here, the Brennan Center does not argue that the records will become stale the day after November 2, 2020.  In fact, the Brennan Center admits that it did not pick the November 2 date for that reason; it seeks processing of its requests by then so it can litigate the merits of any withholdings made by Defendants by the end of the year, when the Secretary of Commerce must

report state-population totals to the President.  *See* ECF No. 12 at 40–41; Tr. at 29.  But even if the Court concluded that the Brennan Center was entitled to processing by December 31, 2020 because the records it requested would be stale after that—and as explained below, the Court does not—the Brennan Center has made no showing at this preliminary stage that it is likely that Defendants will withhold a substantial volume of records from it, or that it would take two months for the parties and the Court to resolve any disputes.[5]

Instead, the Court finds that the Brennan Center *has* shown, for reasons discussed further in its irreparable harm analysis, that it is likely entitled to receive responses to Parts 1–3 of its FOIA requests in time to use them before January 25, 2021.  This is so because, under current law, after the Clerk of the House of Representatives sends to "the executive of each State a certificate of the number of Representatives to which such State is entitled" on that date, the 2020 census and the reapportionment process will be complete.  Thus, this is the rare case where after a date certain, the value of the information sought by the Brennan Center to inform the public about these matters would be materially lessened or lost.  And without a preliminary injunction ordering production by that date certain, based on the estimates provided by Defendants, the Brennan Center will not receive responses to its requests in time to contribute to the public debate and discussion.

In contrast, the Brennan Center has not made the same showing as to Part 4 of its requests, even if Part 4 meets the statutory and regulatory requirements for expedition.  The Brennan Center concedes that agency searches for the records described in Parts 1–3, which are targeted at the issues related to the 2020 census and the reapportionment process on which public

---

[5] Closely related to this, as discussed below, the Brennan Center has not shown that it would suffer irreparable harm if its requests are not processed by November 2.

debate and discussion is focused, will capture most of the documents responsive to Part 4.  Tr. at 36–39.  And it has not shown that it is likely that a document responsive to Part 4 that is not responsive to Parts 1–3 would materially contribute to the debate and discussion about the topics they have identified.  Further, the Brennan Center characterized the individuals and organizations listed in Part 4 as "just additional detail" that Defendants could use as "search terms" to process Parts 1–3.  Tr. at 37.  Thus, under these circumstances, and given Defendants' representations described below concerning the many other demands on their ability to process expedited FOIA requests, the Brennan Center has not shown that the "as soon as practicable" standard requires processing of Part 4 by any date certain.

Defendants, for their part, argue that under the statute they need only process an expedited request "as soon as practicable," 5 U.S.C. § 552(a)(6)(E)(iii), which they assert they are (mostly) already doing, at least as for Parts 1–3, given the long line of pending expedited requests, ECF No. 20 at 19–21.  More specifically, Defendants explain that several of the relevant agencies have FOIA backlogs of hundreds, or thousands, of open requests, including many expedited requests.  ECF No. 20 at 5–7.  In addition, several have small processing staffs.  ECF No. 20 at 6.  These are fair considerations for the Court to weigh.  But the Court cannot "simply . . . take at face value an agency's determination that more time is necessary."  *Elec. Privacy Info. Ctr. v. Dep't of Justice*, 416 F. Supp. 2d 30, 37 (D.D.C. 2006).  Most importantly, Defendants' argument that the burdens of other FOIA requests prevent it from processing the Brennan Center's requests more quickly assumes that the requests remain in the "first-in-first-out" expedited processing queue.  But given that the Brennan Center has met its burden of showing that it is entitled to processing of its requests by a date certain, Defendants may, if necessary, move its requests to the front of the expedited processing line to comply with the

Court's order that they be processed by then.  *See Ctr. for Public Integrity*, 411 F. Supp. 3d at 14. And Defendants have made no showing that they cannot complete their processing of the Brennan Center's requests on the timeline ordered by the Court.

## B.        Irreparable Harm

This Circuit "has set a high standard for irreparable injury."  *Chaplaincy*, 454 F.3d at 297.  Not only must the injury "be both certain and great," and "actual and not theoretical," *id.* (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)), but "the injury must be beyond remediation."  *Id.*  "The key word in this consideration," of course, "is irreparable."  *Id.* (quoting *Wisc. Gas Co.*, 758 F.2d at 674); *see also League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (finding the harm to organizations' efforts to register voters irreparable given the impending election, after which "there c[ould] be no do over and no redress").  The Supreme Court has observed that a public informed about its government's actions is "a structural necessity in a real democracy."  *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004).  And timely awareness is equally necessary because "stale information is of little value."  *Payne Enters. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988).  Therefore, in a few rare FOIA cases in this District involving "ongoing proceedings of national importance," courts have concluded that a delay in processing of a FOIA request would cause irreparable harm.  *Ctr. for Public Integrity*, 411 F. Supp. 3d at 11–13 (collecting cases).  This is one of those rare cases.

The Brennan Center has not shown that it will suffer irreparable harm if its requests are not processed by November 2, 2020, but it *has* shown that such harm will occur if it does not receive responses to Parts 1–3 of its requests in time to use them by January 25, 2021.  This is so because, as the Court previously described, the records it seeks will become stale when the 2020

17

census and reapportionment process ends, upon the Clerk of the House of Representatives sending reapportionment certificates to the States.  Thus, the harm would be beyond remediation because under current law the census and the reapportionment process—and the opportunity for the public to be informed about them while they are ongoing—would be over.  At that point, "the information may still be of historical value . . . . However, for [the Brennan Center], the primary value of the information lies in its ability to inform the public" about those ongoing proceedings. *Ctr. for Public Integrity*, 411 F. Supp. 3d at 12.  The harm would be great under these circumstances as well, given the self-evident importance to the Nation of determining each State's proper representation in the House of Representatives.

The Brennan Center's choice of the November 2, 2020 date is tied to what it seems to assert is the *real* staleness date, the December 31, 2020 deadline for the Secretary of Commerce to report state-population totals to the President.  ECF No. 12 at 38–39.  But there is no reason to think that at that point, the public debate and discussion about the methodology used to calculate and report state-population totals, the potential use of citizenship status data in those calculations, and how the calculations will be used to reapportion the House of Representatives will diminish at all.  Indeed, the debate about those issues may *intensify* after December 31, even as it pivots toward the roles of the President and Congress in the process.  In addition, the Brennan Center has not shown that it will suffer irreparable harm if the Court does not order Defendants' processing of its requests to conclude months in advance of the "staleness date" to account for potential litigation over Defendants' withholdings.  The Brennan Center has made no showing that even if Defendants withhold any such records, those withholdings are likely to be unlawful, and thus, could be the source of any harm.

In addition, the Brennan Center has not carried its burden to show that it will suffer irreparable harm if Part 4 of its requests is not expedited or processed in time for it to use responsive records by January 25, 2021.  As already mentioned, agency searches for the records described in Parts 1–3, which are targeted at the issues related to the 2020 census and the reapportionment process on which public debate and discussion is focused, will capture most of the documents responsive to Part 4.  Tr. at 36–39.  And the Brennan Center has not shown that it is likely that a document responsive to Part 4 that is not responsive to Parts 1–3 would materially contribute to the debate and discussion about the topics they have identified.  Further, the Brennan Center characterized the individuals and organizations listed in Part 4 as "just additional detail" that Defendants could use as "search terms" to process Parts 1–3.  Tr. at 37.  Thus, on Part 4, the Brennan Center's showing falls short of the demanding irreparable harm standard.

Defendants argue that this is a case in which there is no particular time when the records at issue will become stale to the point where the Brennan Center will suffer irreparable harm, and urge the Court to deny preliminary relief for that reason.  *See, e.g., Protect Democracy Project*, 263 F. Supp. 3d at 301–03; *Elec. Privacy Info. Ctr. v. Dep't of Justice*, 15 F. Supp. 3d 32, 46 (D.D.C. 2014); *Long v. Dep't of Homeland Security*, 436 F. Supp. 2d 38, 43 (D.D.C. 2006). They argue that the opportunity for the public to debate and discuss the census and reapportionment process could continue for the next ten years, in the run-up to the 2030 census. Tr. at 44–46.  These arguments miss the mark.  Unlike the situations presented by those other cases, the census and reapportionment processes will end on January 25, 2021.  And the debate the Brennan Center, and the public, are focused on concerns *this* census and *this* reapportionment process, which ends then.

Finally, Defendants argue that the Brennan Center "has not demonstrated that the information it seeks could influence a cognizable body of decision-makers prior to a debate during which the discourse may influence the ultimate outcome," which was, according to Defendants, a key factor in many of the cases cited by the Brennan Center.  ECF No. 20 at 13. But none of those cases apply Defendants' proffered test; to be entitled to a preliminary injunction in a FOIA case, no court has required a plaintiff to show that public debate and discussion, or the outcome of a proceeding, would likely be changed or influenced.  For example, in *Ctr. for Public Integrity*, "the primary value of the information" at issue, namely records regarding the Department of Defense's Ukraine Security Assistance Initiative, was not the likelihood that it would influence the outcome of impeachment proceedings, but rather "its ability to inform the public of ongoing proceedings."  411 F. Supp. 3d at 12.  Similarly, another court focused on the public's "access" to the records as the basis for irreparable harm, *Am. Oversight*, 414 F. Supp. 3d at 187, and still another considered "public awareness" and the public's "ability to make its views known in a timely fashion" on "a matter of current national debate," rather than the likelihood that an impending election would be influenced.  *Wash. Post*, 459 F. Supp. 2d at 74–75.  As in those cases, the Brennan Center seeks records relating to an important public debate and discussion about a process that will come to an end relatively soon. It need not show that the Secretary of Commerce, the President, or Congress will likely be influenced to take any particular action in response to that debate and discussion.

## C.    The Balance of the Equities and the Public Interest

These two factors merge when the Government is the opposing party.  *FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 127 (D.D.C. 2015) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  The balance of equities and the public interest here weigh in the Brennan Center's favor.  Although Defendants will have to process and produce these records quickly, and face

substantial backlogs, their burden is outweighed by the Brennan Center's pressing need for the information and the public interest in being informed on a matter—the 2020 census and reapportionment of seats in the House of Representatives—that is of "the highest national concern." *Ctr. for Public Integrity*, 411 F. Supp. 3d at 15. And Defendants will have about two-and-a-half months to process the request and produce any responsive records.

Defendants argue that the burden of processing these requests on a quick timetable should tip the balance in their favor because they have other FOIA responsibilities, other parties in the FOIA queue will be harmed, and rapid processing "risk[s] disclosure of statutorily exempt material." ECF No. 20 at 5–7, 23. The Court is sympathetic to their predicament. But the Brennan Center has shown that it is entitled to expedited processing by a date certain, and those substantial interests outweigh the hardship to Defendants and other requesters. As one court explained in a similarly unusual situation, "hardship on other FOIA requesters is not a bar to relief. The grant of a preliminary injunction in this case will likely place [the Brennan Center's] request ahead of others in Defendants' FOIA queues. However, the Court finds that the extraordinary circumstances presented in this case warrant such line-cutting." *Ctr. for Public Integrity*, 411 F. Supp. 3d at 14. Moreover, to the extent the documents responsive to the Brennan Center's requests are also responsive to other requests in the queue, the hardship imposed on other requesters will be diminished. "In processing the documents responsive to Plaintiff's FOIA requests, Defendants will also be completing some of the work necessary for processing the other, similar FOIA requests." *Id.* at 14–15. Finally, Defendants' suggestions that inadvertent release of exempted documents *might* occur are insufficient to tip the balance in its favor, especially when the Court is ordering processing to occur on a much more extended timeline than the Brennan Center requested.

**IV.    Conclusion**

For all these reasons, Plaintiff's Motion for Preliminary Injunction, ECF No. 12, will be

**GRANTED IN PART**.  To facilitate the Brennan Center's review and use of any responsive

records before January 25, 2021, the Court will order Defendants, except OLC, to process Parts

1–3 of the Brennan Center's requests and produce *Vaughn* indices to it on a rolling basis by

January 11, 2021, in time for the Brennan Center to make use of the records by January 25, 2021.

A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: October 30, 2020